SAFETY CAR HEATING & LIGHTING CO. v. GOULD COUPLER CO.

(District Court, W. D. New York.   June 22, 1915.   On Rehearing, February 8, 1916.)

No. A–86.

1. PATENTS ⬧◯157—RULES OF CONSTRUCTION.

A patent, when attacked for invalidity, should be viewed in a liberal spirit, and should not only be sustained whenever possible, but the construction placed upon it by the patentee should be adopted, whenever this can be done without excluding anything from it or adding anything to it which is not fairly contained therein.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229–232; Dec. Dig. ⬧◯157.]

2. PATENTS ⬧◯168—RULES OF CONSTRUCTION.

The claims of a patent are entitled to the construction their language naturally imports, and their rejection or replacement by others, or the substitution of a new specification, do not necessarily require the limitation or narrowing of their scope.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½, 244; Dec. Dig. ⬧◯168.]

3. PATENTS ⬧◯328—VALIDITY AND INFRINGEMENT—CAR LIGHTING SYSTEM.

The Thompson patent, No. 1,070,080, for an electric car-lighting system, consisting of a generator driven from the car axle which charges current to a storage battery and lamps, the special features of which are means to prevent the overcharging of the storage battery and to maintain a constant current, notwithstanding variations in the speed of the car or increased voltage of the battery, was not anticipated, discloses patentable invention, and, while not for a pioneer invention, covers an improvement of such utility as to entitle it to a fair range of equivalents; also *held* infringed.

4. PATENTS ⬧◯259—"CONTRIBUTORY INFRINGER"—SUPPLYING PARTS OF INFRINGING STRUCTURE.

Where a person manufactures an essential part of an infringing structure, which is not adaptable to other uses, and disposes of the same to others, with the intention that the structure shall be completed or the remaining parts supplied by the user, he becomes liable as a "contributory infringer."

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 400–402; Dec. Dig. ⬧◯259.

For other definitions, see Words and Phrases, First and Second Series, Contributory Infringement.]

In Equity.   Suit by the Safety Car Heating & Lighting Company against the Gould Coupler Company.   On final hearing.   Decree for complainant.

Duell, Warfield & Duell, of New York City, for complainant.

Kenyon & Kenyon, of New York City (Wm. Houston Kenyon, Richard Eyre, and Gorham Crosby, all of New York City, of counsel), for defendant.

HAZEL, District Judge.   This action was brought to enjoin infringement of letters patent No. 1,070,080, issued to the Safety Car Heating & Lighting Company, as assignee of Harrison G. Thompson,

inventor, on August 12, 1913, on an application dated August 22, 1908, for improvements in electric car-lighting systems, in which a shunt wound generator is driven from the car axle and charges current to the storage battery and lamps; the battery operating as a reservoir for emergency purposes and supplying the lamps with current when the car is standing still, or running so slowly that the generator output is insufficient to supply the demand. Before the Thompson invention in controversy there were a number of patents for train or car lighting systems wherein the current was generated by the car axle, and indeed such prior lighting systems included a storage battery, a generator regulator for keeping constant the generator current, and a carbon pile resistance in combination for maintaining constant the flow of current to the battery and lamps. But such prior patents were not free from objection on account of the danger of overcharging the battery, which interfered with efficient lighting. Specific improvements are claimed to have been made by the patentee to overcome such objections and to produce a constantly useful current in spite of the varying speed of the car and generator, especially with relation to the use of such current in charging the battery and to simultaneous protection of the battery from injurious or wasteful overcharging.

The claims in controversy are the fourth, ninth, tenth, eleventh, twelfth, and thirteenth. The fourth claim reads as follows:

"4. In car-lighting apparatus, in combination, an electric generator, a storage battery connected to be charged thereby, a variable resistance medium comprising a plurality of contacting members adapted to vary their aggregate resistance with pressure thereon, said resistance medium being connected in the field circuit of said generator, a current coil serially connected between said generator and said battery, a voltage coil connected across the charging circuit, separate movable cores respectively coacting with said coils, and means mechanically connected with said cores and tending normally to compress said medium and adapted upon either of said cores being attracted to tend to weaken the pressure upon said medium."

It is a combination claim for car axle lighting, and has the following elements: (1) A generator; (2) a storage battery connected for charging; (3) a variable resistance medium, consisting of a carbon pile rheostat having a plurality of contacting members adapted to vary their aggregate resistance with the pressure thereon; (4) a field circuit; (5) a current coil connected between the generator and battery; (6) a voltage coil connected across the charging circuit; and (7) separate movable cores tending normally to compress the carbon pile, and adapted to weaken the pressure thereon as either of the movable cores is attracted. The asserted new elements of the claim include the voltage coil, the manner of its connection, and the mechanism by which a plurality of disks in the carbon pile are compressed or pressure on the medium weakened.

Claim 9 includes broadly the shunting mechanism, consisting of a magnetic member arranged to co-operate with the current coil to increase the resistance, and "means adapted automatically to complete a shunt about said coil upon the voltage of said generator falling below that of said battery." Claims 10 and 11 specify the various ele-

ments in detail, and concededly are limited to contacts positioned upon the main switch as shown in Fig. 2 of the patent drawings; while claim 12 includes all the essential elements and the arrangement of the parts by which a co-operative result is obtained, and reads as follows:

"12. In car-lighting apparatus, in combination, an electric generator, a storage battery adapted to be charged thereby, lamps connected across said battery, a variable resistance medium comprising a plurality of contacting members adapted to vary their aggregate resistance with pressure thereon, said resistance medium being connected in the field circuit of said generator, a current coil, a magnetic member positioned in the field of said coil, means coacting with said magnetic member and variable resistance adapted to vary the pressure upon said resistance with a variation in current flowing in said coil and tending normally to compress said medium, a switch comprising a voltage coil connected across said generator, and a movable core having a contact member at one end thereof, said switch being adapted to disconnect said generator upon its voltage falling below that of said battery by movement of said contact member, a shunt about said first coil, means coacting with the remaining end of said core adapted to complete said shunt upon said switch being opened, a second voltage coil and means adapted upon said battery reaching a certain state of charge to render said second voltage coil effective in reducing the pressure upon said variable resistance medium."

Claim 13 omits the feature of shunting the current coil by the main switch, but specifies:

"A normally ineffective voltage coil adapted upon becoming effective to control said generator current by acting on the resistance of the generator field circuit, and means adapted upon the voltage of said battery attaining a certain value to render said voltage coil effective in controlling said generator current."

The defense is that the claims, if broadly construed, are invalid in view of the prior art, and, if limited to the device shown and described, are not infringed; that in any event the defendant's generator regulator is a patentable departure from complainant's; and that the defendant was the first to substitute voltage regulation for current regulation to avoid overcharging the battery.

There were irreconcilable differences of opinion among the witnesses as to the fundamental conception of the patent, and the different disclosures of the specification and claims, as well as concerning the result attained. Complainant claims that the specification and claims are clear and definite with regard to substituting voltage regulation for current regulation when the battery is nearly charged, while the defendant asserts that the described means are for charging the battery at one time and discharging it at another, or for positively disconnecting the generator from the battery and permitting the generator to resume action regardless of the speed of the train. The argument is that the patentee contemplated another construction operating on an essentially different principle from the apparatus of the defendant company; that the original claims were improperly amended and broadened to include the defendant's regulator, after its mode of operation had become known to the patentee.

The case was tried in open court by able counsel, aided by competent expert witnesses, and the technicalities made as clear as possible; but nevertheless the abstruseness of the subject-matter and the per-

plexities arising from contradictory testimony render it difficult for me to clearly determine the many questions involved. My conclusions as to the proper construction of the patent have been formed after careful consideration of the evidence and the arguments thereon; but before stating them it will no doubt be helpful to an understanding of the patent from my point of view if I first direct attention to what I believe to be the objects of the invention as indicated by the specification. It is therein shown that the patentee designed by his invention to provide practical and efficient means for charging storage batteries, to provide reliable and sensitive means for rendering the generator inoperative upon its function being performed, and to provide automatic means for enabling the generator to resume its charging action independently of the speed of the train. A general reference to the specification shows that in the shunt field of the generator there is positioned a carbon pile rheostat of a type concededly known in the art at the date of the invention, which operated to change the aggregate resistance of the disks upon the yoke pressing against them, which yoke was caused to move oppositely by a core when coil *12* became energized. Thus the compression of the carbon pile resulted in a decreased aggregate resistance corresponding to the varying spring pressure imposed upon it, and permitted more current to flow through the shunt field circuit, which resulted in the regulation of the current and the generator output.

Figure 2 of the drawings, which is an embodiment of the invention, is herewith reproduced:

Fig. 2.

This sketch shows the field coil in shunt across the generator circuit, the main switch being open and the carbon pile compressed through the mechanism while the spring *10* is pressed against the

yoke, with the result that the resistance in the shunt field circuit is decreased. A plunger or core, about which coil *41* is wound, has also a coil *50* which opposes or substantially neutralizes the effect of an increase of the current through coil *41* due to the decrease in the resistance of the external circuit of the generator. The specification states that:

"In this manner, the additional current is prevented from having a regulating and reducing effect upon the resistance device *3*, and therefore the generator is permitted to furnish sufficient current for the lamps without cutting down the charging current of the storage battery. A relay, comprising a potential or voltmeter coil *26*, contact member *27*, magnets *31* and *32*, and contact members *33* and *34*, is connected to the terminals of the battery *20* in the same manner as already described with respect to Fig. 1, said relay controlling the circuit through the coil *36*, which surrounds the core *37*, which in this instance is connected with the bell crank lever *38*. The operation of this relay and its associated coil is the same as already described with respect to the similar parts shown in Fig. 1. In order that no current from the battery can pass through the coil *50* when the core *44* is in its lowered position, in which position the generator is cut out, a conductor *51* connected to conductor *49* leads to a contact point *52*, adapted when the core is in its lowered position to be engaged by a pivoted contact member *53* connected to the conductor which leads to the lamps *24*, as shown in full lines in this figure. When the current in the coil *43* reaches a predetermined strength, the core will be drawn upward, as indicated in dotted lines, breaking the short circuit by lifting the contact member *53* from the contact point *52* and allowing the current from the battery to flow through the coil *50*. The object of this short circuit device is to permit the generator voltage to pick up when the generator is to be thrown into circuit, which it would not satisfactorily do if the battery current were permitted to pass through the coil *50*, as this current would tend to rotate the bell crank lever about its pivot in such a manner as to separate the carbon disks and therefore increase the resistance of the generator field circuit."

The regulation of the generator is brought about by the action of the series or current coil upon the carbon pile, which evidently operates as an equalizing medium for the current flowing to the battery, responding to its requirements as well as to the lamp load. The main circuit extends to the storage battery for the purpose of charging it, and then passes through the main switch *48* along to the coil of the series winding *45* and to the winding of the regulator, which maintains a constant current notwithstanding variations in the speed of the car or increased voltage of the battery during the charging operation. When the lamps are lighted, the generator current, which ordinarily passes through the storage battery, is caused to diverge, a portion flowing to the lamps and the balance passing to the battery. Then the lamp current passes on to series coil *50* on the generator regulator, and thence to the main switch *47*, where it joins the battery current, and after passing through coil *41* the combined current returns to the generator. Without the enumeration of additional details, I think it will be understood that by such an arrangement of the circuits the lamp circuit comes in magnetic opposition to the battery circuit with the result that the regulation and maintenance of a constant and definite supply of current to the battery, which is the generator current flowing to the battery, is secured irrespective of the lamp lead.

229 F.—28

Another important feature of the patent is that, when there is danger of overcharging the battery, coil *36*, which is located in shunt with the battery current and connected by a lever to the regulator, becomes a factor in increasing the resistance in the field coil and in reducing or discontinuing the generator output. In this connection there is provided a polarized relay arrangement, which upon a full charge to the battery automatically establishes a circuit through the normally ineffective solenoid *36*, which, as said in the specification, "will exert a powerful effect upon the lever and swing the same so as to draw the yoke *5* away from the resistance media *4*, and materially increase the resistance in the field of the generator." By this adaptation the output of the generator is diminished, the voltage coil caused to supersede the series coil, thereby imparting constant voltage regulation in place of constant current regulation, and overcharge of the battery prevented. Means are also provided for protecting the system during the period when the battery alone is supplying current to the lamps. At such time a circuit is established leading from the battery to the lamps without affecting any part of the regulating instrumentality. This is accomplished by a shunt controlled by contacts on the main switch.

The invention, as shown by the evidence, consists principally of (1) a carbon pile resistance in series with the generator field; (2) a current coil adapted to influence the carbon pile in such a way as to control the resistance, thus controlling the generator and maintaining constant the output to the battery; (3) a voltage coil acting upon the carbon pile when there is danger of overcharging the battery; and (4) means for eliminating the current coil or cutting it out of circuit with the battery, so as to enable the latter to supply current to the lamps substantially alone.

Mr. Waterman, expert witness for the defendant, has severely criticized the language of the specification and claims, and, while such criticism was perhaps not altogether unwarranted, I nevertheless think that a proper construction of the patent requires an ascertainment, if possible, of its true meaning or intendment, in order to save it from invalidity, even though there may be imperfections or indefiniteness in the phraseology. The inconsistencies of description, about which much was said at the hearing, were due possibly to the failure of the solicitor to perfectly understand the invention; but my view is that the claims as they were finally allowed by the Patent Office correspond fairly to the description. Both Prof. Clifford, of Harvard University, and Mr. Hammer unqualifiedly testified, not only that the patent was intelligible to them, but that in their judgment the skilled in the art would experience no difficulty in understanding it and reducing it to practice. "Every invention," it is said in Robinson on Patents, § 488, "is a single step forward in the progress of the industrial arts, and cannot be intelligible, except to those who are familiar with the steps already taken and with the object this new advance is intended to subserve."

[1] The rule of law is that a patent, when attacked for invalidity, should be viewed in a liberal spirit, and should not only be sustained

whenever possible, but the construction placed upon it by the patentee should be adopted whenever this can be done without excluding anything from it, or adding anything to it which is not fairly contained therein. Rubber Co. v. Goodyear, 9 Wall. 788, 19 L. Ed. 566; Klein v. Russell, 19 Wall. 433, 22 L. Ed. 116. In Diamond Rubber Co. v. Consolidated Tire Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527, the Supreme Court of the United States, adhering to this rule, substantially stated that if the description is sufficient, so that the skilled in the art can understand it, the law is satisfied; and that "it is no concern of the world whether the principle upon which the new construction acts be obvious or obscure, so that it inheres in the new construction."

The defendant, however, insists that the description covers simply the disconnection of the generator when the car is traveling at high speed, or the inoperativeness of the generator when the battery is near the full charge, and the resumption of the generator charge; but such limitations on the functions of solenoid *36* would not, I think, be a just construction of the patent. Reference is made in the description, it is true, to means for rendering the generator inactive upon its function being accomplished, and means to permit the generator to resume action, irrespective of the speed at which the train is running, and to the "absolute prohibition of any current being forced through charged cells"; but these excerpts should be read with the context, and considered in the light of the invention and its object as disclosed by the evidence.

But, aside from this, Prof. Clifford, in opposition to the literal interpretation of Mr. Waterman, referred to different descriptive phrases, from which it may be inferred that the patentee, in mentioning an "absolute prohibition of any current forced through the charged cells," merely provided for a possible condition. In various parts of the specification it is said that the current is maintained substantially constant, and that when the batteries are fully charged it is desirable "to substantially eliminate the charging current," and such wording, in connection with the quoted excerpts, to which defendant's expert attached importance, indicates that the inventor had in mind a different method of operation relating to the generator current at the time when the battery is supplying the lamps, namely, the depleting of the coil by short-circuiting to weaken the generator field, so that it would have a substantial effect with all variations of speed.

[2] The file wrapper and contents do not, as contended, support a limited construction of the claims in suit; for, although an inspection thereof shows that at different times amendments were made, and earlier claims rejected, the drawings are nevertheless identical with those filed with the application, and, according to a preponderance of the testimony, show the adjustment of the voltage regulator to cause a reduction of the generator output without the necessity of disconnecting the dynamo from the field to protect the battery from overcharging. The claims of a patent are entitled to the construction their language naturally imports, and their rejection or replacement

by others, or the substitution of a new specification, do not necessarily require the limitation or narrowing of their scope. Hess-Bright Mfg. Co. v. Fichtel, 219 Fed. 723, —— C. C. A. ——; Hubbell v. United States, 179 U. S. 77, 21 Sup. Ct. 24, 45 L. Ed. 95; Western Elec. Co. v. Sperry Elec. Co., 58 Fed. 186, 7 C. C. A. 164. Applying this rule to the case at bar, I do not think that errors in the specification as originally filed, or inaccurate statements as to the mode of operation of the lighting system, as correctly portrayed in the drawings and as specified in the claims as allowed, require a limitation of the claims to means for open-circuiting the field of the generator.

[3] As to the prior art: It was old, as heretofore stated, to regulate the generator for a constant current charge of the batteries until the charge reached a predetermined point, and then to reduce the charge by shunt while the current flowed to the lamps. Lighting systems of this type are described in the Bliss patents in evidence; but, after examining them, I have concluded that they do not necessitate narrowing or limiting the scope of the claims in controversy. · In claims 9, 10, and 11 of the patent in suit the generator battery lamps and variable resistance medium are combined with means for completing a shunt about the current coil when the voltage of the generator falls below that of the battery, and therefore it differs from the prior patents.

In Bliss patents, Nos. 799,516, and 863,692, there are means for train lighting which involve the use of a so-called "bucker" generator to neutralize the action of the main generator in order to effect regulation. As such constructions involved the use of commutators, extra brushes, and fields, I do not regard them as bearing materially upon the question of anticipation. In Bliss patents, Nos. 799,517 and 799,-520, the carbon pile controls the field of the main generator; but, as there is no shunt contact in association with the main switch, they are not anticipatory. In Bliss patents, Nos. 572,627, 799,516, and 863,692, the coil which is shunted out of action by contacts on the main switch is one which would tend to build up the generator field, while in the patent in suit the shunting feature eliminates the coil to permit influencing the carbon pile to allow the generator voltage to pick up when the generator comes into the circuit. In the Bliss lighting system the cars are not separately lighted, and, notwithstanding the employment of somewhat similar means for regulating the battery and generator current, I think there was invention in adapting such means to a system for separately lighting cars by the production of a current of constant value for charging the battery and the simultaneous prevention of overcharge.

In the Jepson patent, No. 991,198, issued after complainant's application was filed, the shunt is caused to act by the operation of three switches, thus making a shunt about the current coil, the voltage coil, and a booster; but such patent does not, in my opinion, limit claims 9, 10, and 11 in suit.

The Turbayne patent, No. 760,714, which was owned by the defendant, describes a step by step rheostat resistance, and, though said resist-

ance medium was regarded at the date of the invention in suit as the equivalent of the carbon pile resistance, Turbayne differently wound the current windings, and the practicability of his adaptation is not free from doubt. Although this patent was granted before complainant's, it cannot be considered to anticipate it.

The witness Jepson testified that Turbayne's commercial system was essentially different from defendant's in operation and construction, as it used a small dynamo resistance, instead of a carbon pile; and there was credible evidence to show that it did not light efficiently. For these reasons it is not considered of sufficient importance to invalidate the patent in suit or to limit its claims.

Weight is given to the Dick patent, No. 682,978, which was for train lighting by the use of a single generator affixed to the car axle; but in such system it is testified there were no means to enable lighting the cars while the battery was being charged, nor for protecting the battery from overcharge during the charging process. There is a resistance device pointed out, which it is contended afforded such battery protection; but I am in doubt as to the manner of its operation. Furthermore, the Dick lighting apparatus employed two batteries when the generator was simultaneously supplying current to the lamps and batteries, and therefore it does not disclose the invention in suit.

There was also evidence to show prior use, in that a substitution of voltage regulation for current regulation was first used on the Lake Shore Railroad daily from February, 1908, to October, inclusive. This system, known as the system of Bliss, blueprint 3,041, closely approached the Thompson patent; but nevertheless credible testimony shows that it operated unsatisfactorily. The evidence is that the only shunt in such construction was positioned about the carbon pile, and not about a coil controlling the carbon pile, and that the inefficiency of the lighting system was due to the faulty location of the shunt. It was also shown that this apparatus was supplanted by a different lighting system, and accordingly the presumption is not unwarranted that its use, as claimed by complainant, was merely experimental. Therefore there is disinclination on my part to treat it as anticipatory or suggestive of any of the claims under consideration.

The Creveling patent, No. 920,827, includes a carbon pile resistance in series with the field circuit controlled by a circuit coil acting through a core and lever adjustment, and in this respect is quite similar to complainant's arrangement of the carbon pile. But Prof. Clifford swore that such invention had no normally ineffective voltage coil like that of Thompson, that there was no protection of the battery from overcharging, and that there was no shunt about the current regulating coil. Defendant, however, contends that every element of claims 4 and 13 is embodied in the Creveling construction, except that no relays are used. Prof. Clifford was cross-examined at length on these points, and the definiteness of his answers is questioned; but, on comparison of his testimony with the Creveling specification and drawings, I am of the belief that coil *38* of the Creveling patent in its co-operation with coil *18* does not operate to supersede the current regulation

with voltage regulation, and, though coil *38* is normally ineffective, it does not become effective at a predetermined point, as in the Thompson patent. Hence, in my estimation, there is such an important variance between the Creveling and Thompson patents as to prevent the consideration of the former on the question of the anticipation or limitation of the claims in suit. There was testimony tending to show that Thompson conceived his invention and completed it prior to the date of the Creveling application of May 28, 1908, the Bliss patent, No. 863,692, issued August 20, 1907, and the Turbayne patent, No. 991,106, on application dated May 2, 1908; but such testimony in favor of antedating the patent need not be reviewed, considering the essential differences existing between such patents and the patent in suit.

In a litigation before this court between complainant herein and the United States Light & Heating Co., Creveling patent, No. 747,686, was held valid and of sufficiently broad scope to include a carbon pile resistance in place of a wire rheostat resistance; and in another litigation between the same parties the W. I. Thomson patent, which included a carbon pile in series in the generator field, was held invalid; and it is argued by defendant herein that the effect of complainant's testimony, differentiating the patent in suit from the Creveling patent, is to show that the only novelty was the use of the carbon pile resistance in lieu of the step by step rheostat. Complainant rejoins that the said Creveling patent was for the broad invention; that the introduction of a current coil acting upon the carbon pile resistance to maintain a constant charging current, and of a voltage coil differing from Creveling's which, though normally ineffective, becomes effective at a predetermined time, was an important improvement. There is some doubt in my mind as to whether the arrangement by Thompson of the voltage coil to act upon the carbon pile resistance in series with the generator field, in view of what was disclosed in the Creveling and Thomson patents, involved invention; but, considering the utility of the apparatus, such doubt, I think, should be resolved in favor of the existence of invention. Krementz v. S. Cottle Co., 148 U. S. 556, 13 Sup. Ct. 719, 37 L. Ed. 558.

The prior art, in my opinion, does not disclose the combination of any of the claims in controversy. That the invention in suit was a useful contribution to the art may be inferred from the results which it produced. The record shows that at the time it was conceived a problem existed because of the danger of injury to the battery from overcharging, which skilled electricians were endeavoring to solve, each somewhat advancing the art, but in the main failing to accomplish what was finally accomplished by complainant's patent. And while such patent was not for a pioneer invention in the sense that a new art was discovered, it nevertheless was an improvement in an old art of such significance as to entitle it to protection and the application of a fair range of equivalents in a suit for infringement.

The question of infringement concerns, not only the fourth claim, covering the broad invention, but also the specific claims for practicing it. As the patentee was the first to devise means for successfully safe-

guarding the battery from excessive charge of current from the generator, thus making car lighting more efficient, the claims should be broadly enough construed to include apparatus which adapts substantially similar means and instrumentalities to attain the same result. True enough, in defendant's apparatuses there are differences of construction; but in my opinion they relate to the details of operation only.

At the hearing I entertained the impression that defendant had distinguished its construction from complainant's by connecting the voltage coil to the opposite ends of the carbon pile in such a way as to absolve it from infringement, and that such operation was upon a different principle; but I am persuaded by a fair preponderance of the evidence that that feature comes within the scope of the patent and was not essentially different from complainant's adaptation, or from the panel, Exhibit 15, which was exhibited by the patentee in Chicago in the year 1908, and which was provided with separate movable cores connected with the carbon pile, as specified in claim 4 of the patent. Defendant's operation from opposite ends of the carbon pile does not avoid infringement as the necessary pull was transmissible from the movable cores by one lever as well as two. Nor does it make any difference that in defendant's structure the cores were controlled by weights, instead of springs, for the former undoubtedly were the equivalent of the latter as it was adapted in complainant's patent.

[4] It is unnecessary to dwell further upon the question of infringement, as the apparatus of the defendant as sketched diagramatically in Complainant's Exhibits 8 and 9, was an appropriation of the regulator described in the specification in suit. Exhibit 9 shows a constant current generator system, as distinguished from a constant battery current system, in which a shunt path for short circuiting the current coil was unnecessary; but this difference is not of material importance. In other respects the system is similar to the constant battery current system. It has the main switch with upper contacts and the circuits are arranged to shunt the current coil. Hence said apparatus is convertible without difficulty into a constant battery system by merely changing the lamp leads. To thus construct the device was to infringe claims 4 and 13, and also claims 9, 10, 11, and 12, under the doctrine of Wallace v. Holmes, 9 Blatchf. 65, Fed. Cas. No. 17,100, Thomson-Houston Electric Co. v. Black River T. Co., 135 Fed. 759, 68 C. C. A. 461, and Canda v. Michigan Malleable Iron Co., 124 Fed. 486, 61 C. C. A. 194, which cases substantially hold that where a person manufactures an essential part of an infringing structure which is not adaptable to other uses, and disposes of the same to others with the intention that the structure shall be completed or the remaining parts supplied by the user, he becomes liable as a contributory infringer.

Other reasons are urged by defendant why its lighting systems are not infringements of the patent in suit; but it would serve no useful purpose to separately discuss them. My conclusion is that the claims in Thompson patent, No. 1,070,080, are valid and infringed by the

lighting systems shown in the sketches to which reference has been made, and in bulletins 11–A and 11–B of Complainant's Exhibits 2 and 3.

Complainant is entitled to the relief prayed, with costs.

### On Rehearing.

Duell, Warfield & Duell, of New York City, for plaintiff.

Kenyon & Kenyon, of New York City (Walter C. Noyes, Wm. Houston Kenyon, and Richard Eyre, all of New York City, of counsel), for defendant.

HAZEL, District Judge. Considering this case in connection with various matters argued on the rehearing, I think that I failed in my original opinion to sufficiently differentiate the Thompson patent in suit from the prior Turbayne patent, No. 760,714, the Bliss patents, Nos. 799,516 and 799,520, and Bliss Bulletin No. 20, and therefore, for the sake of clarity, I am filing this supplementary opinion, without, however, changing the conclusion heretofore reached that the claims in controversy are valid and infringed by the defendant.

We are not here concerned with a patent performing a function never before performed, but with an improvement in a car-lighting system relating specifically to a method of charging storage batteries in connection with generators driven by car axles with a view of making this operation more simple and efficient. To accomplish this the patentee provided sensitive means for making the generator inoperative upon the instant the battery is fully charged, and for permitting the generator to resume its work regardless of the speed of the train; such means consisting of the combination and arrangement of elements set forth in the specification and claims. In prior car-lighting systems, as shown in the Creveling patent (Safety Car Heating & Lighting Co. v. United States Light & Heating Co., 222 Fed. 310, affirmed 223 Fed. 1023, 138 C. C. A. 651), it was demonstrated that, to secure better and more economic results and to effectively avoid injury from overcharging the battery, means were necessary (automatically operated) for materially decreasing the generator output without affecting the battery, which should continue to supply current to the lamps. As the lamps, when lighted, do not require as much current as is required to keep the battery charged, a rapid or gradual reduction of the current output is necessary to prevent overcharging. The patentee in his improvement arranged the generator in shunt and provided: (1) A carbon pile resistance, to maintain a normal output, and made the same responsive to changing conditions of operation; (2) a current coil, to control the carbon pile in series to obtain a constancy of charge to the battery; (3) a voltage coil, to decrease the charging current; and (4) a cut-out, to regulate the battery when it alone supplies current to the lamps. There are many intricate details of operation and co-operation, as indicated by the quotation from the specification contained in the original opinion; but the merit of the invention resides in the adaptation of means by which a variable balance of current flow was maintained.

I have been much concerned about the proper interpretation of claim 4, which defendant insists is anticipated by the Turbayne patent heretofore mentioned, and which in the original opinion was held not anticipatory, as it disclosed a differential current winding and its practicability was considered doubtful. I should have stated that the main distinction is that claim 4 calls for separate movable cores respectively coacting with the current and voltage coils and functioning to compress the carbon pile resistance, and includes a voltage coil connected across the charging circuit and a voltage coil that is normally ineffective, while the Turbayne patent is without such elements or their equivalents. Although in a sense the separable movable cores of Thompson with voltage and current windings correspond to a single core with different windings, the latter nevertheless is unable to function in the same way as the former, or to efficiently protect the battery. It is important that the voltage coil should be normally ineffective until the predetermined time when it supersedes the current coil to control the generator. Professor Clifford clearly testified that there was a real point to the effect of separate cores, even though they put the winding *36* of the Thompson patent upon a single plunger with windings *41* and *50*, saying:

"All the time when the battery is being charged by a constant current, current regulation being secured by these current coils on that plunger, all that from *36* is exactly as if it did not exist because it is not in circuit. It does not do it until the contact *27* (relay) comes on the contact *30*. In other words, that contact not being operated by *26* until the battery is at danger point; that is, just exactly as if they were out of the system entirely. In other words, there is no voltage regulation until the battery is at full charge. It is merely current regulation."

"We find that [in Thompson] there are not only separate cores, but in effect separately movable cores, because in the first part of its cycle *36* is nonexistent, and in the second part of its cycles *41* and *50* are nonexistent so far as their regulating effect is concerned."

Turbayne's arrangement of the current coils and voltage coil $F^2$ around a single core functioned to affect the core and the step by step resistance as soon as the voltage was on the battery because of the combined action of the two current coils, one in series with the lamps and the other acting in opposition thereto. Such arrangement I think was incapable of producing the stop charge effect aimed at by the patentee or of producing a normally ineffective voltage coil. It is true claim 4 does not specify a normally ineffective voltage coil or a relay to make it effective, but the claim must be construed to cover the actual invention; that is, as if such features had been specified therein, since they are substantially described in the specification. Fowler & Wolfe Mfg. Co. v. McCrum-Howell Co., 215 Fed. 905, 132 C. C. A. 143.

It is further urged that claim 13, which does not include a carbon pile, is anticipated by the Creveling patent. Although Creveling broadly indicates means for protecting the battery from overcharge, I am quite convinced that his means for controlling the rheostat resistance in series with the voltage field of the regulator were different from complainant's, in that he specified no current coil acting upon a resist-

ance medium to maintain a constant current and no voltage coil coming into action at a predetermined time. Coil *31* of his patent does not correspond to the normally ineffective voltage coil of the Thompson patent, and therefore the Creveling patent neither anticipates nor limits claim 13 in suit.

The Bliss patents, Nos. 799,516 and 799,520, are claimed to anticipate claims 9, 10, and 11 in controversy. Such claims, though not specifying as an element a voltage coil acting upon a carbon pile to protect the battery from overcharge, nevertheless include the feature of completing a shunt about the current coil when the voltage of the generator falls below that of the battery. The Bliss patents, as heretofore pointed out, are descriptive of a bucker system of train lighting; but defendant claims they are not limited to that, and, indeed, in patent No. 799,520 it is stated that a carbon pile may be substituted for the bucker, or that other suitable means may be used for regulating the flow. I nevertheless think that such patents are not anticipatory, as even with the carbon pile arrangement they were incapable of achieving the result of the invention in suit, owing to the fact that the resistances were positioned in parallel, and were not usable for efficient field regulation of the generator in a car-lighting system. It makes no difference that it was possible for them to use a carbon pile in lieu of the bucker by completing a shunt about the current coil when the voltage was decreased below the battery and thus to operate somewhat similarly to the patent in suit, for it is believed that the simplicity of co-operation attained by Thompson would not have followed. In such a situation the defendant cannot avoid infringement by merely proving that part of the entire invention is contained in one prior patent and part in another. Parks v. Booth, 102 U. S. 96, 26 L. Ed. 54; Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68. And also I am still of the opinion that it was not an obvious thing for a skilled engineer to change a system for train lighting in which the generator was located in the baggage car or locomotive into a practicable system for separate car lighting in which the generator is driven by the car axle.

Bliss Bulletin No. 20 was not discussed in the original opinion, but it was not overlooked. It was believed that, as claims 9, 10, and 11 included as an essential element a variable resistance medium with the current coil in shunt for regulating its action—a feature not found in the Bulletin—it was not an important reference. Besides, the Bulletin specified a rheostat regulator coacting with vibrating contacts which operate by cutting in and out of the circuit. Such a contrivance could not evenly regulate the current and was based upon an essentially different element from the patent in suit.

Nor are claims 4 and 13 invalid because of anything contained in Jepson patent, No. 981,198, which describes regulation of the current to the battery by a booster device to assist the generator voltage in performing its function. In that patent coils *33* and *50* together controlled the resistance of the carbon pile and maintained the voltage of the generator constant. Certainly the carbon pile was not controlled, as in the Thompson patent, by a current coil until the voltage of the battery neared full charge, when the voltage operates to supersede

the current coil to decrease the output of the generator. Hence Jepson failed to accomplish the object of claims 4 and 13.

Claim 12 of the Thompson patent does not specify the relay or voltmeter (*26* and *34*) connected to the voltage coil *36*, but specifies "means adapted upon said battery reaching a certain state of change to render said second voltage coil effective in reducing the pressure upon said variable resistance medium"; while claim 13 specifies "means adapted upon the voltage of said battery attaining a certain value to render said voltage coil effective in controlling said generator current." The specification clearly shows what the means were to which the said claims refer, but they are not limited to such relay device or instrumentalities for accomplishing the desired results. While the patent was for an improvement, it nevertheless brought into the art a new and novel combination or arrangement of elements, separately old, but which achieved a new and useful result in car-lighting systems, and therefore the claims are entitled to a fair range of equivalents. A construction of such scope should be accorded them as to include a car-lighting system embodying a combination of the elements in suit which achieves substantially the same results.

Claim 4 is in my opinion infringed by the defendant company, for in its car-lighting system it uses in combination a generator, a storage battery, a carbon pile or variable resistance medium arranged in the field circuit of the generator, which operates to vary the aggregate resistance upon compressing the disks, a current coil serially connected, a voltage coil connected across the charging circuit, which under normal conditions is inert or uninfluenced, but which becomes effective when the accumulator is nearly fully charged; the voltage or energy passing through the voltage coil at such time being of sufficient potentiality to raise the separate movable cores, which are connected so as either to compress or to attract the carbon pile resistance. Defendant also embodies in its apparatus the elements of claim 9 (typical of claims 10 and 11), which includes the current coil and the specified means coacting with it to increase the resistance when the carbon pile is attracted, and "means adapted automatically to complete a shunt about said coil upon the voltage of said generator falling below that of said battery." By a lever mechanism operating upon the carbon pile there was secured a regulation of the movements of the core, and by opening the circuit and closing the shunt the battery was permitted to supply current to the lamps as in complainant's apparatus.

There was much discussion as to whether claims 12 and 13 were infringed, as concededly the defendant does not use a polarizing relay mechanism in its apparatus, nor an energizing coil functioning like coil *36* of the Thompson invention. It is, however, proven that to accomplish the same result defendant utilizes the magnetic pull or conductivity of the voltage coil to balance weights on the lever, thus securing the inertia of the core until the storage battery is substantially charged, when the strength of the voltage coil raises one core and releases the other, which then rests upon its stop. The series coil then becomes ineffective, leaving the control of the generator voltage to the voltage coil, as in complainant's patent. The question of whether

the defendant's embodiment comprises the means of the said claims in suit is not free from difficulty. But as a normally ineffective voltage coil for voltage regulation is used, and is arranged to become effective to supersede the series coil in supplying constant voltage regulation in lieu of constant current regulation, thus protecting the battery from overcharge, the claims are believed to be infringed by the defendant. They are not, as contended, for a mere result, and the defendant by its employment and arrangement of instrumentalities utilizes the principle upon which the Thompson invention is based. Surely defendant had an object for apportioning and attaching weights to the dash pot, and for adjusting the lever mechanism and winding the coil in a certain way, which object no doubt was to secure inertia of the voltage coil up to a certain degree of battery charge and then to render it effective.

Claim 13 is not anticipated by Dick patent, No. 682,978; my reason for such conclusion being stated in the original opinion. Other matters argued at the rehearing are also deemed by me to have been sufficiently covered in the original opinion.

As the defendant's system embodies the elements of the Thompson system in suit, operates in substantially the same way, and produces the same result, a decree for complainant may enter; but, on the assumption that defendant will wish to appeal, counsel are advised that a supersedeas will be allowed.