### SAFETY CAR HEATING & LIGHTING CO. v. UNITED STATES LIGHT & HEAT CORP.

(District Court, W. D. New York.   October 19, 1916.)

No. 163–B.

1. PATENTS ⊜⊐328—INFRINGEMENT—SYSTEM OF ELECTRICAL DISTRIBUTION.
   The Creveling patent, No. 747,686, for a system of electrical distribution as applied to axle-driven car-lighting apparatus, *held* not infringed.
2. PATENTS ⊜⊐328—INFRINGEMENT—SYSTEM OF ELECTRICAL DISTRIBUTION.
   The McElroy patents, Nos. 720,605 and 893,533, for systems of electrical distribution as applied to car lighting, *held* not infringed.

In Equity. Suit by the Safety Car Heating and Lighting Company against the United States Light & Heat Corporation. On supplemental bill by complainant, and counterclaim by defendant. Decree for defendant on bill, and for complainant on counterclaim.

See, also, 233 Fed. 1007.

Duell, Warfield & Duell, of New York City (C. H. Duell, F. P. Warfield, H. S. Duell, and L. A. Watson, all of New York City, of counsel), for plaintiff.

Jones, Addington, Ames & Seibold, of Chicago, Ill. (W. Clyde Jones and Arthur B. Seibold, both of Chicago, Ill., of counsel), for defendant.

HAZEL, District Judge. The bill alleges infringement of Creveling patent, No. 747,686, dated December 22, 1903, which was adjudicated valid and infringed as to claims 1 to 8, inclusive, in a prior action against the predecessor of the defendant company. See Safety Car Heating & Lighting Co. v. United States Light & Heating Co. (D. C.) 222 Fed. 310, affirmed 223 Fed. 1023, 138 C. C. A. 651.

---

⊜⊐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1] The present defendant is charged with marketing a structure embodying the essentials of the adjudicated patent. The claims insisted upon are the third, sixth, and eighth, but it will suffice to set out the third, as the others embody substantially the same elements. It reads as follows:

"3. In a system of electrical distribution, the combination of a generator, automatic means for maintaining the output of the generator practically constant throughout changes in speed, and electromagnetic means determining the said output to be maintained."

In the former case the complainant moved for a reference for an accounting of the infringing structures manufactured and sold by defendant's predecessor and known as constant current or stop charge and taper charge lighting systems, including later adaptations by this defendant, which were stated to be colorable modifications; but it was claimed in opposing affidavits that the later apparatus disclosed a principle of operation patentably different from Creveling's, and was indeed constructed under two prior patents to McElroy, No. 720,605, dated February 17, 1903, and No. 893,533, dated July 14, 1908, describing a voltage or potential regulation to which the defendant connected an ampere hour meter for battery protection, claimed to have been invented by one Bliss, and functioning to cut off current passing to or from the battery.

Upon the filing of a supplemental bill alleging infringement by the later structures, a motion was heard for a preliminary injunction based upon the prior adjudication. It was urged by defendant that it had departed from the so-called constant generator output regulation during speed variations, and was operating a system described in two McElroy patents of which it was owner in combination with the ampere hour meter, and thereupon the motion for an injunction was denied. The answer of the defendant, in addition to the denial of infringement, contains a counterclaim under new equity rule 30 (198 Fed. xxvi, 115 C. C. A. xxvi), charging infringement by complainant of the McElroy patents in the manufacture and sale of its system, known as "Safety Type F." Considerable testimony of a highly complicated nature was taken in open court on behalf of both sides, much of which bears only remotely on the merits of the controversy.

For convenience it may again be stated that the Creveling patent discloses a generator which supplies current to the lamps and to a storage battery, from which the lamps are supplied when the train stops or travels at greatly reduced speed. The generator has a shunt field winding with a variable resistance in its circuit, controlled by a regulator having a current coil 8 "in the generator main circuit," which is shown to be responsive to current changes, owing to the opposing influence of field coil 9. By such regulating arrangement the electric current is maintained constant, though normally its tendency would be to increase or decrease according to the speed of the train, as the generator, it should be understood, is geared to the axle of the car. The structure embodies a relay which is subject to battery voltage and is automatically varied with changes in the

lamp load, and which functions to protect the battery from overcharge.

The specification refers to modified structures. In Figure 1 the regulator coil is connected in circuit to maintain constant the total output of the generator. When the battery is being charged, while current flows to the lamps, there is a variation in the battery current, due to the demands upon it of the lamp load, but the total output of the generator remains constant. Figures 2 and 3 show a relay or solenoid having an opposing winding in the circuit, to neutralize the effect of the solenoid through wires in the lamp circuit, with the result that the resistance *15*, which by its wire connections is in shunt with the regulator coil *8*, is varied. In consequence of such arrangement the charging of the storage battery is determined by the relay, and is subject to variation by a lamp switch or resistance, which also causes a varying of the effect upon the regulator coil. In this manner the lamps are energized, including circuits *40* and *41* in series therewith. It is clear that Figure 2 differs from Figure 1, in that the resistance which is introduced by rheostat *15* is not introduced in the circuit of coil *9*, but is in a circuit arranged as a shunt around coil *8*, thus weakening the latter and causing a definite current to be delivered to the line for supplying both the battery and lamps. In this way the constant current output of the generator is modified, so as to supply sufficient current for the varying demands of the load. In Figure 3 is shown another modified construction attaining substantially the same result. Reference is made to a relay or solenoid *31* in shunt to the generator circuit by wires *45* in series with the resistance to the lamp circuit; that is to say, not across the generator mains, but connected across the lamps and between the resistance *18* to the lamp switch. A further detailed description of Figure 3 is unnecessary; it being sufficient to state that it shows a regulation for constant battery current which may be modified by changes in the lamp load without impairing constancy of generator output. The specification discloses a dual arrangement, viz., a generator which controls for constancy of current to compensate for speed changes, and supplementary means for protecting the battery from overcharge.

The opinion of this court in the former action states that the combination of the litigated claims was a new combination producing a new and useful result, and that the claims were entitled to a fairly liberal interpretation. As to this aspect of the controversy the opinion still obtains, since insufficient ground is shown for imposing a limitation requiring the regulating coil to be located in the main circuit. Merely changing the regulating coil from the main circuit to the battery branch, if its function remained unchanged, would not avoid infringement. But defendant contended that the claims under consideration were limited by the proceedings in the Patent Office, by the testimony of complainant's expert witness Hammer in the former suit, and by counsel at the hearing, and that complainant, therefore, is precluded from asserting anything more than was allowed him in the Patent Office. These insistences were involved in

considerable dispute, especially the statement that Mr. Hammer's testimony in the present suit was inconsistent with that given by him in the former suit. After reading his testimony in both suits in connection with the specification and Figures 2 and 3, it cannot justly be contended that his prior testimony limited the Creveling invention to maintenance of constant total generator output, regardless of variations in speed and lamp load; nor has he testified, as claimed, that the Creveling system is one wherein the dominating coil of the regulator must be connected in the main circuit. Counsel for defendant have seemingly overlooked the fact that the excerpts reproduced in their brief from Mr. Hammer's testimony in the former suit relate mainly to one form of construction, that illustrated in Figure 1, and that the claimed inconsistencies occurred in answers to assumptions embodied in certain questions put to the witness on cross-examination in respect to the capacity of the generator, etc. A careful reading of Mr. Hammer's testimony in both suits indicates clearly enough that from his viewpoint, as specified in Figure 1, the Creveling system discloses means for regulating for constant battery current, while the constant generator output at the same time is responsive to varying speed, or while the constant battery current is modified to compensate for variable lamp load.

On both sides it is recognized that when the application for the patent in suit was filed there were two systems of current regulation in the car axle lighting field, operating by fundamentally different methods. Although these systems came into interference in the Patent Office, both patentees from the beginning, as appears by the file wrapper and contents, were satisfied that the means described in their respective applications for regulating the current charged to the battery were very unlike and operated on essentially different principles. In the one case the means were for regulating a *constant current* from the generator, while the voltage varied, and in the other (McElroy patent, No. 893,533) for securing a *constant potential* on the main circuit, regardless of the quantity of current flowing therein, and the variation in speed and load. To this extent both the Creveling and McElroy patents are limited to specific types of regulators. In dismissing the interference, with the consent of the interferants, the Commissioner of Patents said:

"The parties have different objects in view and have produced different structures for accomplishing their objects."

Therefore, it is believed, in view of the decision in the former case, wherein the prior art was sufficiently differentiated from the Creveling patent, that the principal questions involved herein are whether defendant's constructions, the ampere hour systems as outlined in Exhibits H and S, are infringements of the claims in suit, and whether complainant's "Safety Type F" apparatus is an infringement of the McElroy patents. Do defendant's systems contain a regulation by voltage control, tending towards constancy of voltage, or are they regulated by current control, tending towards constancy of current? Do such systems embody evasions of the Creveling claims in suit by the continuance of a regulating coil as the dominant feature in the con-

trol to compensate for varying speed and load? Answers to these inquiries are fraught with difficulty, inasmuch as the opinions of the expert witnesses are very contradictory, and, in fact, in positive disagreement on many important points. Without recourse to the testimony of witnesses relating to the construction and adjustment of defendant's panel and the results achieved, as indicated by tests made, it would be almost impossible to believe that the experts had been of any great assistance to the court. It has been said that upon no question do experts disagree oftener than on the question as to whether a difference is a difference in form or in principle, and that therefore the weight of their opinions must be judged by the other circumstances of the case. In patent law it is settled that if the alleged infringing device shows a substantially different mode of operation, even though the result of the operation remains the same, infringement is avoided. Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 25 Sup. Ct. 697, 49 L. Ed. 1100; Brooks et al. v. Fiske et al., 56 U. S. (15 How.) 212, 14 L. Ed. 665.

Defendant's constructions, as shown in Exhibits H and S, are practically alike in mode of operation, each embodying a generator delivering current to the battery and lamps; the strength of the generator field being governed by resistances (carbon pile) in its circuit, and operated by a relay or solenoid (coils *13* and *11*) positioned, not in the main circuit, but between the supply mains and in shunt with the lamps. Coil *13*, concededly a voltage coil, normally has in its circuit a resistance *14* which in action limits its energizing power, while coil *11*, concededly a current coil in series with the battery, acts to maintain the charging current constant. By such arrangement, the defendant contends, a constant voltage is maintained upon the current supply main without regard to variable speed or variable lamp load, a result opposite from complainant's is secured, and the voltage or potential of the generator is maintained constant, and varies the dynamo output to meet variations in lamp load, while in Creveling the output of the dynamo is maintained constant with varying voltage.

Counsel for complainant in their brief state:

"If coil *13*, the voltage coil, is the dominant coil—that is, exerts the major corrective force in the regulation—this system is voltage control. Conversely, if the series coil *11*, the current coil, is dominant, and is the determining factor in the regulation and exercises the major corrective force, the system is current controlled. The conflict between Mr. Hammer and Professor Clifford, and Mr. Webster and Mr. Bentley, is as to the relative dominance of the voltage and current coils."

The evidence of defendant in its entirety preponderatingly shows that in defendant's structure the voltage coil *13* is the dominating force for constant voltage regulation; that there is a co-operation between coils *11* and *13*, which results in constant generator voltage in spite of changes in speed or lamp load, coil *11* functioning to respond according to battery conditions, modifying the flow, while coil *13* is principally responsible for the constant voltage regulation.

Upon this phase of the controversy there was much evidence regarding the action of the two systems when some, or all, of the lamps were turned on and the load varied; the defendant contending that

its use of the constant voltage system with the ampere hour connection, and not the constant current or current control system of Creveling, is indubitably shown. Complainant objected to the admission of testimony by defendant relative to certain tests made by it, characterizing the tests as impracticable and unreliable; but such testimony is entitled to weight—more weight, in view of the fact that it relates to matters actually within the knowledge and experience of the witness, than is given to testimony based simply upon theory or opinion. Overweight Counterbalance Elevator Co. v. Improved Order of Red Men, 94 Fed. 155, 36 C. C. A. 125.

The chart, Exhibit M, indicates the result of a test made with the stop charge system which was held an infringement in the former action, and illustrates the total output of the generator, maintained at 43 volts regardless of lamp load. Exhibit Y is illustrative of generator action when there is variation of speed and load, and shows characteristics of constant generator output, regardless thereof. In both charts are indicated increase and decrease of generator voltage to meet changing conditions. In Exhibit K is shown a test of defendant's standard system, Exhibit H, with constant speed and variable lamp load, indicating that the total generator output was variable. It is fairly shown that the normal current of the battery is undisturbed by the lamp load addition to the generator output, indicating that the battery may be charged while the generator supplies current to the lamps. The regulator operates to increase or decrease the generator output and its supply to the lamps, while at the same time the generator voltage is maintained substantially constant in spite of variations of speed or variations in lamp load; the generator output, however, being subject to changes due to lamp conditions.

The testimony of the witnesses Mead, Gaertner, Cunny, and Wray relates to the manner of constructing the panels used by defendant. It is shown that coil 11, a modifying coil, was always connected in the battery branch; that all the panels were adjusted and tested to maintain constant current and variable output; that the voltage coil 13 (Exhibit S) was adjusted in relation to resistance 14 to maintain the generator voltage at 45 volts on an open circuit; and that with the circuit closed coil 11 operated to lower the generator voltage, which was maintained constant. It was further shown that frequent measurements were made of the voltage for current in the defendant's system, and that the generator voltage was always maintained constant, regardless of changes in speed and changes in lamp load. The witness Wray testified that he had made tests or measurements of defendant's system in operation on the New Haven Railroad by connecting ammeters and voltmeters in the circuit, noting the effect of the starting and stopping of the train at frequent intervals, and that the voltage remained practically constant in spite of varying conditions of load, while the generator ampere varied with the number of lamps used, increasing as lamps were turned on, and decreasing as lamps were turned off. That the character of the tests was not improper or unusual is evidenced by the acquiescence of Professor Clifford, who said that placing a voltmeter on the system to measure

the voltage was a good way to make the test. His calculations in opposition to their correctness, based upon the number and character of the ampere turns in the series coil, have not been overlooked; but the probative force of such calculations does not outweigh the demonstrable fact that the voltage coil *13* in defendant's system is the principal factor in the regulation, and not the current coil, as in complainant's.

Nor, according to a preponderance of the evidence, has the defendant departed from the McElroy patents by the addition of the ampere hour meter, thereby acquiring the supplemental battery protective means of claims 3, 6, and 8, in suit. The single purpose of the meter device, which is independent of the back voltage of the battery, is to measure the amount of current flowing to the battery, and the mere presence of the ampere hour meter is no particular aid in establishing that defendant's system is either current regulated or voltage regulated. In the Creveling patent the protective device has reference to a regulator for determining a constant generator current, and a broad construction of the claims, including such element, would seem to encroach upon the prior McElroy patent, No. 893,533. In the earlier McElroy patent there is an axle-driven carlighting system, in which the generator was capable of charging the storage battery and supplying current to the lamps at the same time, regardless of changes in the lamp load. The storage battery had a variable voltage, and the patentee, to overcome difficulties in maintaining the same constant to the battery and lamps in spite of variation, adapted a double-deck arrangement. He devised means for an automatic readjustment of the lamp resistance, and provided a second regulator for correcting speed variations, while in his improvement patent he positioned a modifying coil in the battery branch to co-operate with the main regulating coil and to modify its action so as to accommodate the storage battery and protect it from overcharge.

A comparison of defendant's present systems with McElroy's shows that, though they are not alike in all particulars, the essential elements of one are present in the other. For instance, the resistance *8* in the shunt field circuit of defendant's structure corresponds to the resistance *K* in the McElroy patent, the carbon pile being the equivalent of the wire resistance, and the principal coil *13*, connected in circuit between the supply mains, is the voltage coil *C* of McElroy, while the modifying coil *11*, or the means for protecting the battery, is connected in the battery branch. In operation, the defendant's system maintains a constant generator voltage in spite of variations in the lamp load, while varying the total generator output to correspond with changes in the lamp load. Such system, therefore, is believed to be the McElroy constant voltage system—a system which is operated upon a different principle from the Creveling patent in suit.

The assertion that the McElroy structure was impracticable and worthless, as a constant voltage system has not been proven. It appears, on the contrary, that in 1899 it was used experimentally on half a dozen railroad cars, and that later it was redesigned to in-

case the lamp and generator regulator, and to overcome minor troubles due to defective commutation, troubles which, however, did not interfere with maintaining the voltage on the lamps practically constant. In addition to such use, it has been used commercially by the defendant since its discontinuance of the stop charge and taper charge systems.

[2] As to the counterclaim: The "Safety Type F" apparatus manufactured by the complainant is claimed to be an infringement of both the McElroy patents, in that it utilizes the double-deck idea of constant voltage, with the addition of the modifying coil. But it is believed that the primal embodiment in the first McElroy patent was the governing coil $C$, connected across the generator mains to affect the generator regulator, and to induce responsiveness to generator voltage by which it was exclusively controlled. Complainant's apparatus does not embody such a regulation or its equivalent. Much was said, it is true, regarding the arrangement of what was designated the two-level or double-deck voltage, but the McElroy patent does not broadly claim such an arrangement; its primary object, as already stated, being the regulation by a constant voltage generator regulator with a constant voltage lamp regulator. Under such a lighting system the constant voltage regulation is continuous from the beginning of the battery charge to the end. In "Safety Type F" the arrangement of the various elements is such that in operation there is a period of current control tending towards constancy of battery charging, superseded by a period of voltage control tending towards constancy of voltage control to protect the battery from overcharge.

Both McElroy patents were on essentially different lines from the Creveling patent, their modes of operation were different, and they produced different results. In complainant's structure the current is maintained constant during most of the time of battery charging, that is, for about four hours at from 64 to 60 amperes, and, upon imminence of overcharging, the protective means operate to reduce the generator output. Defendant's counsel, contending that complainant has adapted the McElroy principle in its apparatus, argues that the current coil $L$ (see Exhibit R) operates only during the greater part of the battery charging period, and then only to prevent a tendency of the current to increase, but without preventing any decreasing tendency. But this contention is strongly negatived, and it is believed that the regulating coil of complainant's structure prevents the flow of excessive current, regulating both for increase and decrease of current.

It would be of no benefit to discuss these patents at greater length, nor need other points argued herein be considered. The conclusion reached is that the "Safety Type F" system is not an infringement of the McElroy patents, or either of them.

A decree may be entered establishing that Exhibits H and S, defendant's systems, are not infringements of the Creveling patent in suit, and dismissing the supplemental bill and the counterclaim.