SAFETY CAR HEATING & LIGHTING CO. v. UNITED STATES LIGHT
& HEATING CO.

(District Court, W. D. New York.  December 11, 1914.)

No. A-2.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—CAR LIGHTING SYSTEM.

The Creveling patent, No. 747,686, for a system of electrical regulation
adapted for use in supplying current to the lamps of railroad cars, con-
sisting essentially of an axle driven generator in connection with a stor-
age battery, which takes any surplus current and supplies the same to the
lamps when the car slows down or is at rest, was not anticipated, covers
a practical and operative device, and discloses invention.  Claims 1-8
also *held* infringed.

In Equity.  Suit by the Safety Car Heating & Lighting Company
against the United States Light & Heating Company.  On final hear-
ing.  Decree for complainant.

Duell, Warfield & Duell, of New York City (C. H. Duell, F. P. War-
field, H. S. Duell, R. S. Blair, and D. G. Haynes, all of New York City,
of counsel), for complainant.

Jones, Addington, Ames & Seibold, of Chicago, Ill., and Kenefick,
Cooke, Mitchell & Bass, of Buffalo, N. Y. (W. Clyde Jones, Arthur B.
Seibold, and Edwin B. H. Tower, Jr., all of Chicago, Ill., of counsel),
for defendant.

HAZEL, District Judge.  The bill in this case alleges infringement
of letters patent No. 747,686, granted to John L. Creveling, December
22, 1903, for a system of electrical regulation adapted for use in sup-
plying current to the lamps of railroad cars.  There are 11 claims in the
patent, but 8 only are alleged to be infringed by the lighting system of
the defendant company.  This court recently had before it for deter-
mination in another case between the complainant and defendant here-
in, argued and submitted just before this case was submitted for de-
cision, the asserted infringement of the Thomson patent which it was
claimed was an improvement on the Creveling patent in suit, and the
opinion in that case is filed simultaneously with this.  222 Fed. 318.

We are herein principally concerned, first, with the combination of
means whereby the current output of the generator, which is belted to
the car axle and which runs at rates varying with the speed of the
train, is maintained at substantially constant voltage, thus producing
steady and continuous car lighting; and, second, with the combina-
tion for protecting the storage battery from overflow or exhaustion—
the means affording such protection being an automatic device which
opposes the generator voltage and modifies or alters the flow of the
generator current by increasing or decreasing it at variable stages or
periods.

The specification of the patent under discussion, supported by the
explanations of the expert witnesses, clearly indicates that in the de-
scribed system of electrical regulation the total current output of the

generator is steady and continuous while the train runs at a rate of 15 miles or more an hour; that the lamps are in parallel and the current controlled by a main field coil 8 in the main circuit, forming part of the field winding of pilot motor 7, while the other part of the field winding of the motor is coil 9, thinner than the main field coil, which opposes the latter and causes the fields to operate so as to neutralize one another. The pilot motor is not in the magnetic field and therefore does not operate, and any slight armature current there may be is without operative effect; but the function of coil 9 is to receive the excess current flowing through coil 8, the field of which then preponderates, causing the armature to rotate in such direction that the worm 36 and wheel 37 swing the rheostat arm 20 to provide the additional resistance in the field circuit of the dynamo. By this arrangement of the parts there is produced a weakening of the field circuits of the dynamo which then operate to restore the current to a normal flow. When there is a decreased current in the generator field there is a stronger flow in coil 9 which causes the actuating means of the rheostat arm—that is, the worm and wheel—to rotate in an opposite direction, decreasing the resistance of the field circuit of the dynamo and securing a normal current. The changes of the voltage are frequent, and, owing to the worm and wheel connection, the movements of the rheostat arm are also frequent, corresponding thereto to maintain a practically constant generator output until the battery is sufficiently charged, and this, regardless of the varying speed of the generator or variations in resistance of the main circuit. It will be understood, I take it, from what has been said, that variance in the current flow due to variation in the speed of the train or to the turning on or off of the lights is equalized by the adaptation of the means hereinbefore described, and that when the lamps are lighted the total current from the dynamo is divided between the lamps and the storage battery; the former taking only the amount required by them for lighting, and the latter the balance for subsequent utilization.

The mechanism by which the storage battery or accumulator is protected comprises a solenoid device (31) connected across the principal wires of the generator and on the side of the line switch (6). When the battery is charged to nearly its full capacity the voltage increases, so as to enable the solenoid to influence the contact arm (34) and bring into operation a resistance (15) and hence a lowering of the electromotive force in the field coil (9) below the force of the current which flows through the main coil and causes the pilot motor to rotate in a direction to effect another resistance in the main circuit which reduces the generator output, again neutralizing the current of the field coils. The function of the automatic switch is manifestly to break the main circuit whenever the generator voltage is low, although there may be a discontinuance of the current to the battery while the switch is closed, this occurring whenever the flow is greatly diminished, as, for instance, by the stopping of the train or by its slowing down below 15 miles an hour. In further explanation of the function of the protection device when the train starts up after coming to a full stop, the complainant's brief accurately says:

"As coil *31* is on the side of the automatic switch away from the battery, it can get current from the battery only when this switch is closed. As the train again speeds up or starts up, the automatic switch *6* is closed, and the original cycle of operations completed, except only in the case in which the battery is still fully charged; that is, at about its full-charged voltage. If such is the case, the coil *31* immediately performs its functions to cut down or cut off the charging current. If, however, the battery is not at or near this full-charged voltage, the practically constant generator output, at its normal value, is maintained as usual."

The principal advantages claimed to attach to the patent in suit are that the normal relation of battery and generator is at all times maintained and that any depletion of current in the battery by reason of lamp load or from stoppage of the train is instantly made good, thus securing continuous and steady lighting for the cars.

A diagrammatic sketch (Fig. II) attached to the specification is herewith reproduced.

Fig. II.

Claim 5, which is typical of the other claims, reads as follows:

"5. In a system of electrical distribution, the combination of a generator, and accumulator charged thereby, means for maintaining the current output of the generator practically constant throughout changes in speed, and automatic means, controlled by voltage of the accumulator, for altering the current upon changes in voltage of said accumulator."

The claims do not in terms refer to a railroad car lighting system; but the specification describing the generator and its purposes, and the adaptation for charging the battery to maintain the current output constant, leaves no doubt in the mind that the claims are in fact limited to an electric car lighting system. The prior art, thus limited, is subject to scrutiny.

The defendant insists that, long before the invention in suit was conceived, generator regulators were used commercially, first separately, and later in connection with a protection device to prevent overcharging the battery by shutting off the current or reducing its flow. It is no doubt true that the operation of an electric magnet in series with a generator or with the main circuit to control a variable resistance rheostat located in the field winding to vary the current from the dynamo was an old expedient in the electric art at the date of the Creveling patent. The patents to Brush, No. 224,511, and to Weston, No. 292,715, for example, describe means for maintaining a constant current output. Brush used a series wound generator, while Weston used one that was shunt wound; both preferably used a step by step wire rheostat for their variable resistance device; but they used them in different fields, Brush in shunt, and Weston in series. Both systems related to arc lighting, and in my estimation have no material bearing upon the combination in suit, for they contain no means for charging a storage battery to supply current to the lamps when the generator fails to do so.

The patent to Faure of 1888 is a more important citation, and on inspection plainly reveals a storage battery in connection with an axle driven generator for car lighting, the battery being used to supply current to the lamps when the car slowed down or was at rest. Faure, who was a skilled inventor of storage batteries and electrical appliances generally, was the first person to invent a storage battery for supplying current to the lamps when the generator was at rest. He adapted an automatic switch to connect and disconnect the battery from the main lead, and he preferably combined the same with a current regulator; but he appears to have failed absolutely to markedly advance the car lighting art, or to make it as efficient as Creveling designed to do. Faure used a shunt wound type of generator, and his variable resistance was of the step by step rheostat type in series with the shunt field winding; but concededly his patent went no further and is devoid of means for protecting the battery from overcharging. To provide against failure of the current to flow to the lamps while the car was stationary or slowing down, he connected a secondary battery or accumulator in a separate circuit, and utilized it at such periods to furnish the required current. Complainant's expert witness swears that the arrangement of the parts in the Faure patent allows the current from the battery to reach the dynamo when the latter is motionless, and that at times the dynamo supplies current to the storage battery and to the lamps, but that at other times the storage battery supplies current to the generator resulting in much waste of electricity, an objection which Creveling designed to remove. I am convinced that the two patents are essentially different and operate on principles at variance with one another.

In the Brush patent, No. 281,175, which was for a stationary lighting system, there is a combination of a constant current regulator, a storage battery, and a device for preventing overcharging of the battery; but when the battery is completely charged it is disconnected

from the line by an automatic switch device. It is clear enough that said switch does not operate to regulate the current output as does the said automatic stop charge regulator of the patent in suit. Nor do I find anything in the Badt patent suggestive of complainant's combination, save that it makes clear that storage batteries were used in combination with generators, receiving current from them, and that overcharging was prevented by disconnecting them from the circuit by a suitable stop charge device. Badt did not have in mind an adaptation for maintaining a constant current output from the generator for the purpose of supplying current to the lamps from both the generator and battery, but simply means for keeping the charging current constant—an adaptation quite different from that of Creveling.

I now come to the Emil Dick prior car lighting systems, the United States patent No. 682,978, dated September 17, 1901, and the Dick foreign publications, to which great importance is attached by the defendant to establish the invalidity of the patent in suit. It is urged that Dick disclosed the precise combination in suit, namely, a constant current regulator for keeping the generator current practically constant during the time the battery is being charged, together with means for protecting the storage battery from the current, and that the latter means consisted of a relay which operated automatically, by reason of the increased voltage when the battery was sufficiently charged, to modify the current so as to prevent overcharging. There was much testimony in relation to such Dick apparatuses and prior publications, and although they are by far the best references and bear definitely on car-lighting systems, I am nevertheless of the opinion, after carefully considering everything that has been argued by counsel for defendant, that neither the Dick patent nor his car-lighting systems are anticipations of the patent in suit.

The lighting system of Creveling was essentially different from those of Dick, for one of the objects of the former was, I repeat, to provide means for keeping the generator current constant, or as nearly so as possible, by using the main circuit through which the generator current flowed, while the object of the latter was to provide means for changing the circuits, resistances, and regulating coils whenever the lamps were turned on or off, without, however, having in mind keeping the generator output constant or protecting the battery. The automatic means in Clevering's lighting system were controlled by the voltage of the battery. This is shown by the fact that the relay coil modifying the current is on the generator side of the automatic switch or across the main terminals, while the relay in the Dick lighting systems was connected across the line on the battery side of the main switch $E$ and was not responsive to the generator voltage with the switch open. The disadvantage arising from such location of the switch was that the modifying device at all times remained energized, even when the train stopped and the switch closed, which decreased the generator current and interfered with suitably lighting the cars.

In Vienna Street Poelten Lighting System, cited to anticipate or limit the claims of the Creveling invention there were, it is true, means

for keeping the charging current constant while the lights were turned out; but there is nothing therein to suggest means for maintaining practically constant the generator output. It is rightly claimed, I think, that the controlling coil in the Dick apparatuses is cut out when the lights are turned on, and that then both the generator and the battery supply the current required by the lamps; the battery voltage meanwhile being continually decreased so that the generator, to continue the light, is required to supply an increased current output which obviously would be varied by adding to or taking from the lamp load. Certainly there is no such constancy of current during the period of illumination or while the battery is being charged as in Creveling's adaptation. The operation of charging the battery without interfering with the luminosity of the lamps was of the essence of his invention. In order to charge the battery in the cars and trains in which the Dick lighting systems were installed, so that lighting would be uninterrupted when lighting was required, it was necessary to run the cars or trains at times when lighting was not required. How, therefore, can it be doubted that Creveling, assuming the operativeness of his invention which secured uniform lighting of the car at all times and under all conditions without extra runs, made a meritorious advance in the art?

There was also evidence indicating that the stop charge relay of the Dick apparatuses operated only intermittently. The Elektrotechnische Zeitschrift, under date of April 28, 1898, from which I quote, would seem to bear out this view:

"The relay only enters into operation when the charging is finished, while the same is disconnected when the dynamo supplies current to the lamps. * * * The circuit, however, has undergone a modification, viz., in the conductor leading from the dynamo to the main line the entire resistance $B$ and an additional winding of the regulator is interposed, while the previous connection with the relay is interrupted."

From this it would seem to be true that the batteries or accumulators of the Dick devices were not kept fully supplied with current by a battery controlled by its voltage, and evidently had a tendency to become depleted while the lights were out.

The "Danish court train system" for lighting trains, as distinguished from separate car lighting, is also in my judgment essentially different from the apparatus in suit. It was necessary in such lighting system to keep two storage batteries in each car; one being used to supply the lamps with current after exhaustion of the other and while the latter was being recharged. No means are shown therein for constantly controlling the generator output. The feature of connecting the relay on the battery side of its automatic switch, and not on the generator side, was retained, with the result that such device failed to open at the proper time, and the automatic switch was ineffective upon its voltage. Nor are means shown for controlling the battery by the changes of the voltage, or of protecting it when a certain voltage is reached, and for these reasons the system was objectionable and faulty and incapable of furnishing continuous and steady illumination to trains running at variable rates of speed.

In the Aussig-Teplitzer lighting system there is also a variation in the generator output, owing to the utilization of changing resistance shunts around the current coil of the regulator, and to the coaction of the voltage coil with the current coil. No means are shown therein for opening the automatic switch device when the train stops or decreases its speed. While there is much testimony to show that such apparatuses embodied both the constant current regulator and battery protection device of the patent in suit, I am nevertheless persuaded by the evidence in its entirety that the Creveling lighting system operated on a different principle, and that in the Dick systems the generator output was not maintained practically constant, as in the patent in suit, and that there were no similar automatic means for controlling the battery voltage for altering the current upon the battery changes.

Was the patent in suit impracticable and inoperative? Impracticability and inoperativeness are asserted upon various grounds, but principally upon the ground that there was too much friction in the triple sliding contacts or in the wire rheostat in series with the shunt field winding of the generator. Considerable time was devoted to this subject, but in view of the broad scope to which I think the claims are entitled it would serve no useful purpose to extend this opinion by a narrative of all the asserted defects in the Creveling system. While it was not free from crudity and minor imperfections, I feel certain that it was operative.

The complainant did not rely entirely upon the presumption of operativeness and practicability which goes with the grant of a patent, but supported the presumption by the testimony of Hammer, Thomson, and Hulse. Professor Hammer substantially testified that the step by step rheostat with wire resistance units in series with the shunt field winding of the generator was a practical and operative device. It was not, he said, the precise form of rheostat employed at present, important improvements having been made—the wire rheostat having given place to the carbon disk rheostat; but in his opinion Creveling's adaptation was practicable. Thomson testified that he was present when an apparatus constructed in accordance with the patent in suit was successfully operated; that such sytsem with a regulator arm over a step by step rheostat was operated in the plant of the Safety Company for a period of nine months, and that during such period of time he tested the regulator, using a spur gear in place of the worm and wheel arrangement of the specification in suit, and an arm sliding up and down, instead of in a semicircle; but these differences were nonessentials. Hulse testified that in 1902 he was in the laboratory of the Safety Company, and saw there the Creveling lighting apparatus in operation, that the illumination of a bank of lights was satisfactory, and that there was no apparent trouble from the use of the triple rheostat.

It is, however, conceded, as heretofore stated, that in the early stages the apparatus did not operate with the same facility as later, when a carbon disk resistance was substituted for the wire step by step resistance; but, as said by Judge Coxe, in Electric Smelting & A. Co. v. Pittsburg Reduction Co., 125 Fed. 933, 60 C. C. A. 636, 643:

"It is rarely that an invention develops ultimate perfection in the hands of the inventor. The test of actual use discovers defects to be remedied and suggests improvements to be made. If the inventor produces a new and useful result, he does not lose his reward because he, or some one else, subsequently renders it more useful."

And the learned court then stated in the opinion an analogous case from a kindred art which bears instructively on the present case.

Although the elements of the combination in suit separately were old, they nevertheless were substantially new in combination and in their mode of co-operation, and the defense of noninfringement, in view of the liberal scope to which the patent is entitled, requires but brief attention. Both the so-called stop charge and taper charge systems of the defendant company are operated in substantially the same way as the Creveling system in suit, and they accomplish the same result. There are indeed differences of construction, as, for instance, the strengthening of coil (9) in the defendant's system instead of weakening an opposing coil as in Creveling's system; the use of a weight for retraction instead of a spring; and the use of a carbon pile resistance instead of a wire resistance. But I think these differences or improvements are nonessential. It is immaterial that Creveling's generic invention was later improved by the defendant, or by Moskowitz, or by Thomson, by the substitution of one element for another. The employment by the defendant of the means relating to governing or controlling the output of the generator for charging the accumulator and for lighting, and also the means relating to the automatic altering of the current by changes of the voltage of the battery so as to protect it from overcharging, constitutes infringement.

A decree may be entered in favor of the complainant, with costs, holding claims 1 to 8, inclusive, valid, and infringed.