SAFETY CAR HEATING & LIGHTING CO. v. GOULD COUPLER CO.

(Circuit Court of Appeals, Second Circuit.    January 9, 1917.)

No. 69.

1. EVIDENCE ⟨⟫506—OPINION EVIDENCE—SUBJECTS ON WHICH COMPETENT.
   The testimony of experts in an infringement suit as to the meaning of untechnical words used in the patent, which it is the province of the court to determine, is incompetent.
   [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2309.]

2. PATENTS ⟨⟫177—CONSTRUCTION—SCOPE OF INVENTION.
   While a patentee is entitled to all the fairly disclosed possibilities of his invention, whether specifically described or not, unless he has foregone a part of his right by limitations in his claims, where the claims are for combinations of old elements, and the invention is in the combining, it is essential to discover, not what somebody else could do with those elements, but what the patentee did with them.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 253, 254.]

⟨⟫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. PATENTS ☜328—VALIDITY AND INFRINGEMENT—CAR-LIGHTING SYSTEM.
   The Thompson patent, No. 1,070,080, for a car-lighting system, construed, and *held* not infringed.

   Coxe, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of New York.

Suit in equity by the Safety Car Heating & Lighting Company against the Gould Coupler Company. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 229 Fed. 429.

Appeal from decree in equity finding infringement by defendant-appellant of claims 4, 9, 10, 11, 12, and 13 of patent No. 1,070,080, granted August 12, 1913, to Harrison G. Thompson, for a "car-lighting system." The claims in suit are as follows:

"4. In car-lighting apparatus, in combination, an electric generator, a storage battery connected to be charged thereby, a variable resistance medium comprising a plurality of contacting members adapted to vary the aggregate resistance with pressure thereon, said resistance medium being connected in the field circuit of said generator, a current coil serially connected between said generator and said battery, a voltage coil connected across the charging circuit, separate movable cores respectively coacting with said coils, and means mechanically connected with said cores and tending normally to compress said medium and adapted upon either of said cores being attracted to tend to weaken the pressure upon said medium."

"9. In car-lighting apparatus, in combination, an electric generator, a storage battery adapted to be charged thereby, lamps connected across said battery, a variable resistance medium connected in the field circuit of said generator, a current coil, means comprising a member of magnetic material coacting with said current coil and tending to increase said resistance as said member is attracted, and means adapted automatically to complete a shunt about said coil upon the voltage of said generator falling below that of said battery.

"10. In car-lighting apparatus, in combination, an electric generator, a storage battery adapted to be charged thereby, lamps connected across said battery, a variable resistance medium comprising a plurality of contacting members adapted to vary their aggregate resistance with pressure thereon, said resistance medium being connected in the field circuit of said generator, a current coil, a magnetic member positioned in the field of said coil, means coacting with said magnetic member and variable resistance tending to vary the pressure upon said resistance with a variation in current flowing in said coil, and means controlled in accordance with the relative voltages of said generator and said battery and adapted substantially simultaneously to disconnect said generator and shunt said coil.

"11. In car-lighting apparatus, in combination an electric generator, a storage battery adapted to be charged thereby, lamps connected across said battery, a variable resistance medium comprising a plurality of contacting members adapted to vary their aggregate resistance with pressure thereon, said resistance medium being connected in the field circuit of said generator, a current coil, a magnetic member positioned in the field of said coil, means coacting with said magnetic member and variable resistance tending to vary the pressure upon said resistance with a variation in current flowing in said coil, a switch comprising a voltage coil connected across said generator and a movable core having a contact member at one end thereof, said switch being adapted to disconnect said generator by movement of said contact member upon the generator voltage falling below that of said battery, a shunt about said first coil, and means coacting with the remaining end of said core adapted to complete said shunt upon said switch being opened.

"12. In car-lighting apparatus, in combination, an electric generator, a

storage battery adapted to be charged thereby, lamps connected across said battery, a variable resistance medium comprising a plurality of contacting members adapted to vary their aggregate resistance with pressure thereon, said resistance medium being connected in the field circuit of said generator, a current coil, a magnetic member positioned in the field of said coil, means coacting with said magnetic member and variable resistance adapted to vary the pressure upon said resistance with a variation in current flowing in said coil and tending normally to compress said medium, a switch comprising a voltage coil connected across said generator and a movable core having a contact member at one end thereof, said switch being adapted to disconnect said generator upon its voltage falling below that of said battery by movement of said contact member, a shunt about said first coil, means coacting with the remaining end of said core adapted to complete said shunt upon said switch being opened, a second voltage coil, and means adapted upon said battery reaching a certain state of charge to render said second voltage coil effective in reducing the pressure upon said variable resistance medium.

"13. In car-lighting apparatus, in combination, a generator having a shunt field winding, a storage battery connected to be charged thereby, a resistance medium operatively connected with the field circuit of said generator, means comprising a coil serially connected between said generator and said battery adapted upon the current therein tending to increase, to so affect said resistance as to weaken the field of said generator and normally to maintain said current substantially constant, said resistance being normally free from other effective electrical influence, a normally ineffective voltage coil adapted upon becoming effective to control said generator current by acting on the resistance of the generator field circuit, and means adapted upon the voltage of said battery attaining a certain value to render said voltage coil effective in controlling said generator current."

Figure 2 of the patent, which was used by all witnesses as exhibiting the matters in controversy, is inserted on the page following:

Richard Eyre, William Houston Kenyon, and Walter C. Noyes, all of New York City, for appellant.

Duell, Warfield & Duell, of New York City (Frederic P. Warfield, Charles H. Duell, H. S. Duell, and L. A. Watson, all of New York City, of counsel), for appellee.

Before COXE, WARD, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). Electric-car-lighting systems, depending ultimately upon axle driven generators, did not originate with this patentee; nor regarded as new articles of manufacture did any component part of the system disclosed by him. This is so fully admitted by all parties that no further comment is necessary. Every claim in suit is for a combination, or co-ordinated arrangement, of well-known electrical tools or appliances, to the end that such arrangement may produce a result desirable, useful and novel; and of course what is patented is not the result, but the embodied means by which the same is reached.

Nevertheless the nature of the combination, and therefore of the invention, cannot be grasped unless the wished-for result, the patentee's desideratum, is first understood. The contest between these litigants is, at bottom, as to the meaning of sentences and phrases used in the specification and claims, whereof the words require little if any exposition, not obtainable from technical handbooks of approved authority. The parties diverge radically even when stating in most general terms the object of invention, and such difference serves as a starting point for investigation.

Plaintiff holds that the invention is "an improvement in the means for assuring the production of a current of constant value, notwithstanding the variations in speed of the generator, due to the changes in speed of the car, thereby assuring a steady and efficient output of current, *with special reference to the use of such current in charging the storage battery, while at the same time protecting the storage battery from the injurious effects of overcharging.*" Therefore the system disclosed and claimed is one in which the "current output of the generator (is) *materially diminished* when the battery has been fully charged, to prevent overcharging," the "injurious effects of which are well known, and need not be reviewed"—in the argument from which these quotations are taken. The foregoing is plainly descriptive of a combination of parts, capable of adjustment within the limits loosely indicated by the phrases "materially diminished" and "injurious effects"; if this view is correct, any diminution of current avoiding a surcharge deemed injurious by the operator, is within Thompson's invention.

Defendant, on the other hand, considers the system under consideration as one which "to achieve the broad result of protection of the battery from overcharge, effects successive long periods of charge and discharge; these periods being initiated and controlled by apparatus acting to initiate one condition when the battery is charged, and the other condition when the battery is discharged. The period of charge is one wherein the generator is rendered operative by being in circuit; the period of discharge is one wherein the generator is rendered inoperative by being disconnected at the main switch, even though its speed is above its normal cutting-in speed." This description presents as the patentee's purpose, a current supply to the lamps proximately emanating from the battery, until the storage cells have reached a predetermined stage of weakness, the generator being until then out of action; the dynamo then resumes operation primarily for the purpose of again charging the storage battery.

Thus plaintiff asserts that the disclosure of the patent is of a system wide enough to cover a mere reduction of charging current without disabling the generator, one in which the battery may be an adjunct kept in reserve until such time as slowing or stoppage of the car renders its use necessary; while defendant declares that Thompson invented and described a plan for primarily using the storage battery with the generator in reserve as a sort of pump, to (so to speak) fill up the tank when need arose. To resolve this difference resort must be had to the specification and drawings, with such definition or explanation of technical terms, and words of art as may be necessary; but such explanations once made, the first question is of the meaning of a written document, a meaning to be spelled out of its four corners, and usually to be established before recourse is had to the file wrapper for further light, while the ascertainment of meaning always precede any consideration of equivalents.

[1] The record herein largely consists of the opinions of expert witnesses as to the meaning of words and phrases needing no definition; such testimony (if it can be given that name) is a volunteering of duties laid by law on jury or court, and should not be suffered. Opinion evidence, on the very point submitted for decision, is always incompetent. Turning to the patent itself to ascertain its meaning, it is first observable that no provision is made for regulating the voltage of the lamps. Of this omission plaintiff's expert says "the patent does not concern itself (therewith), * * * it is concerned with dynamo regulation." The statement quoted is obviously consonent with what the patentee says, viz.: that his invention relates "to the charging of storage or secondary batteries"; one object being to provide means "for the efficient charging of a storage battery," in which "the charging generator is rendered inoperative upon its functions being accomplished." The natural inference from these words is that the generator's function is accomplished when the secondary battery is charged.

Another stated object of the inventor was to "provide automatically acting means adapted to permit the generator to resume action independent of the speed at which the train is running." The means for arriving at these results are shown in the diagram prefixed hereto. The main switch (48) is shown open, but, conceiving it closed, the path of the main generator circuit is seen passing around a solenoid core (40) in and through the current coil (41). A sufficient increase of current draws up the core; such core movement affects (through lever 38) the carbon pile resistance (4) mounted in the field circuit of the generator, and so in a manner confessedly old restores the current to normal.

But if no more in the way of regulation were done than this, the announced object of the patentee would fail, for no means would exist of preventing battery overcharge. This Thompson effects by what he calls a "relay" comprising the "voltmeter coil 26," in conjunction with "contact member 27"; an apparatus which when the battery voltage is high enough, will move the "contact member" so as to energize coil 32, and that in turn attracts the armature 33, and so closes a circuit from the battery through coil 36, which acting on core 37, pro-

duces movement of the same lever on which the current coil operates, and increases resistance in the carbon pile, thus diminishing the generator current flowing through the main circuit, until (the battery current overcoming that from the generator) the core (44) of the main switch drops, the switch opens and the generator is out of service.

When the battery has discharged to the predetermined limit the "contact member" (27) produces an engagement at 29, coil 31 is energized, armature 33 moves to its core, and coil 36 is disconnected. This brings the parts of the carbon pile closer together, lowers resistance in the field circuit, enables the generator to pick up, whether the car is going at or in excess of critical speed, and the main switch closes, re-establishing the main circuit. Voltmeter coil 26, however, operates slowly, so that not until the "contact number 27" re-establishes contact at 30, does the cycle recommence.

[2] That this is possible round of movement in the apparatus shown is not denied, but is said to be too literal, or (in the language of an expert) does not seek to find out what the patent discloses "as an operating device." This phrase seems to suggest that the court must read into the specification what might have been done with the tools or means mentioned by the inventor. Undoubtedly he is entitled to all the fairly disclosed possibilities of his invention, whether specifically described or not, unless he has foregone a part of his right by limitations in his claims; but where the claims are for combinations of old elements, and the invention is in the combining, it is essential to discover, not what somebody else could do with those elements, but what the patentee did with them. The old question recurs: What was this particular patentee's contribution to the sum of human knowledge?

Thompson says in so many words that coil 36 (the voltage coil) will "exert a powerful effect" on the field circuit, and such would naturally be the case by reason of the distance from the fulcrum at which power is applied. And it is "in this manner" that the current is reduced or "substantially terminated," and (continues the specification) this action results "in the absolute prohibition of any current being forced through the charged cells. The lamps are then operated by the battery, the generator giving no output." And when the battery voltage has fallen below the arranged limit, the apparatus described "permits the generator safely to resume action" and "normal charging conditions are again resumed."

To us it is clear from the foregoing that the patentee did not describe nor invent, a regulation by or through a voltage coil; he has such coil, and it is useful in his system for the designed purpose—i. e., the disconnection of the generator at the appointed time, and that time was when the battery was substantially charged; further he wished to do this because he desired the prohibition of any current through the charged cells. It will not do for plaintiff's expert to say that Thompson did not mean "any current"; neither witness nor court can declare that a man did not mean (and is not bound by) what he said in so solemn a document as a patent specification.

The result is that when plaintiff asserts that the operation of coil

*36* is to supersede the current coil and assume control of the operation of the regulator (i. e., resistance pile), when it is necessary to protect the battery from overcharge, the statement is only true in the sense that plaintiff can take and has taken (in its commercial installation) the familiar electrical appliances enumerated in the specification, and so rearranged them as to regulate by a voltage coil; but the voltage coil of the patent as described, only regulates in the sense of stopping; that was what the patentee wanted, and he evidently wanted it because he devised an apparatus for preventing *any* current passing through charged cells.

The record is full of lectures by the experts on the meanings found by them in the specification language; a proposition probably as crucial as any (in arriving at comprehension of plaintiff's contention) is one of Mr. Hammer's (expert for plaintiff). He was asked whether the patent disclosed regulation by core *36*, or a system in which that coil acted to disconnect the generator and do no regulating; and he answered "it does both, * * * it may do either, if properly adjusted and prepared for that purpose." This is probably quite true, in the sense that a voltage coil will perform either function; but the question before us is, what will the voltage coil of Thompson do, "substantially as described"? The quoted words being implied in every claim. The answer is that it disconnects and does not regulate, and there is nothing in the patent to show that Thompson wished it to regulate, and much to prove that he did not. He said he wanted a "normally ineffective voltage pile," and the only work suggested for it is to exert a "powerful effect" on the resistance, to the end that an "absolute prohibition of *any* current" through the charged cells may result.

[3] The system of the patent, thus interpreted, is comprehensible, and so far as we can learn novel; to go further is to rewrite the specification. The defendant's system is one of admitted regulation by the action of current and voltage coils, so adjusted for amperage and voltage as to enable the core of each coil to act on one end of the resistance pile. The voltage coil is connected across the generator, and not (as in the patent) across the battery circuit. No more detailed description of this device need be given, as its construction and operation are not in dispute.

The defendant's device, compared with that revealed by the patent does not infringe claim 4, because it is a wholly different scheme or system; but more specifically it possesses no "voltage coil connected across the charging circuit" functioning or capable of acting in the only way Thompson disclosed his voltage coil as functioning, and the only way he thought of using this piece of old apparatus, viz. by adding the pull of the voltage coil to whatever strength the current coil might exert, whereas the defendant's voltage coil itself regulates the generator output, whenever it is active, and then it alone pulls on the resistance, wholly superseding the current coil. This the patented system could not be arranged to do, without a redistribution of parts not suggested by the patent. Claim 13 is not infringed, because defendant's structure has no means "adapted upon the voltage of the

battery attaining a certain value, to render the voltage coil effective in controlling the generator current," viz. the system of relays by which coil 36 is put into the battery circuit. Nor can any equivalent for this element be found in defendant's apparatus. It was said by Mr. Hammer that defendant had no relay, but did have means for rendering the voltage coil effective. This is true, but they are not plaintiff's means, and are not asserted to be, except by so reading the patent that any means productive of regulation by voltage, infringe. We have already indicated our opinion that this patent reveals no intent to regulate by voltage, except as stoppage is regulation; but, even on plaintiff's reading, *all* means of control by voltage cannot be covered. If claim 12 be more than an aggregation, the patented combination is not infringed for the same reasons hereinabove stated as applicable to claim 13.

The remaining claims in suit (9, 10, and 11) cover combinations, whereof the element not appearing in other claims is, as phrased in claim 9 "means adapted automatically to complete a shunt about (the current) coil, upon the voltage of (the) generator falling below that of (the) battery." As was stated of record below, "shunts are the A B C's of the electric system," and plaintiff relies, not on the fact that the patentee shunts the current coil, but that the combination of apparatus described coacts to produce some new result. Reference to the specification shows that the object of this short circuiting is to prevent the current coil having any effect on the dynamo, when the generator is speeded up from rest, which would be the case if contacts *52* and *53* were not closed when the main switch is open, thus short-circuiting or shunting the current coil out of the main circuit.

But if this application of electrical usage has been made before for substantially the same purpose, it cannot be used to vivify and validate a combination claim, which, with this shunting omitted, would confessedly be worthless. The patents to Bliss, 799,516 and 799,520, plainly reveal shunting contacts used for the purpose in question, and it was admitted by plaintiff's witness that if Bliss' system (designed for a plurality of cars) could be used on one car, it showed the very thing used by defendant, and used for the same purpose. No satisfactory reason is given for the assertion that the shunting contacts of Bliss depended for utility on a plurality of cars. It was admitted that the "mechanism was there," but was not "very useful."

Jepson, 981,198, shows and describes shunting contacts, which clearly do cut out the current coil when the generator is picking up. It is contended that, because the styles of contact vary from those disclosed in the patent before us, no limitation is imposed by the reference. But the question is whether the defendant's apparatus does or does not contain a short-circuiting or shunting device, similar to and serving the same purpose as, that disclosed by the prior art patents. We feel assured that it does, and that therefore such apparatus cannot infringe. So far as Thompson's rights go, any one can do what Bliss and Jepson did; whether the combination of the patent, in the exact form disclosed, is or is not valid, need not be decided.

The sum of our decision is that, reading the patent according to its

plain words, and not admitting the glosses and amendments volunteered by plaintiff's experts, no infringement is shown; therefore the decree below is reversed, and the cause remanded, with directions to dismiss the bill, with costs in both courts.

COXE, Circuit Judge (dissenting). This action was brought upon claims 4, 9, 10, 11, 12 and 13 of the Thompson patent, No. 1,070,080. It was tried by Judge Hazel who heard the testimony of most of the important witnesses in open court and, after giving the testimony careful consideration, he concluded that the claims above enumerated were valid and infringed. Subsequently a motion for a rehearing was made and the cause was reargued before Judge Hazel who again considered the issues with care and reached the same conclusions, filing an amended opinion restating his views.

The impression which I obtained at the argument, and which has been strengthened by an examination of the evidence and of Judge Hazel's opinions, is that Thompson made an unquestionably meritorious advance over the prior art. His was not a broad generic invention but constituted a highly useful advance in an important branch of industry. Judge Hazel took unusual care in the examination of the testimony and exhibits and, being convinced of the great utility of the invention, has overruled the defenses, most of them being technical in character. It seems to me that this meritorious patent can be defeated only by taking a circumscribed view of the invention and an erroneous view of the prior art. Thompson unquestionably made an advance in the art of electric car lighting. His patent can be defeated only by limiting it to the precise construction shown. Why should it be so limited? It should be so construed as to give him the fruits of the improvement he has made.

The decision of the District Court, after an usually careful consideration of the prior art, has given him this and nothing more. I think it unnecessary to go further into details. To do so would simply involve a restatement of the propositions discussed and decided in the opinions below.

For these reasons I feel constrained to dissent.