SAFETY CAR HEATING & LIGHTING CO. v. GOULD COUPLER CO.

(District Court, W. D. New York. September 11, 1917.)

No. 153-B.

1. PATENTS ⬤�top328—INFRINGEMENT—ELECTRICAL REGULATION.

The Creveling patent, No. 747,686, for a system of electrical regulation for use in car lighting, *held* limited to a constant current regulator, as distinguished from a constant potential regulator, and, as so limited, not infringed.

2. PATENTS ⬤�top243—INFRINGEMENT—COMBINATIONS.

To establish infringement of a patent for a combination of old elements, it is not enough to point out substantially the same elements in combination in defendant's structure, but it must also be shown that defendant's system performs substantially the same function in substantially the same way as complainant's; and where the result is attained by a new combination operating upon different principles,· and constituting a radical departure from complainant's patent, there is no infringement.

3. PATENTS ⬤⟩327—INFRINGEMENT SUITS—EFFECT OF DECISION.

In a patent infringement suit, it is the duty of the court, regardless of prior decisions on the question of anticipation, to give force and effect to the evidence in the pending case, and resort to the testimony of other expert witnesses in a prior action is not warranted.

In Equity. Suit by the Safety Car Heating & Lighting Company against the Gould Coupler Company. Bill dismissed.

See, also, 230 Fed. 848.

Randolph Parmly, of New York City (Robert S. Blair, Lucius E. Varney, and Delos G. Haynes, all of New York City, of counsel), for plaintiff.

Kenyon & Kenyon, of New York City (Wm. Houston Kenyon, Richard Eyre, and Theodore S. Kenyon, all of New York City, of counsel), for defendant.

HAZEL, District Judge. The John L. Creveling patent in issue, No. 747,686, granted December 22, 1903, for a system of .electrical regulation, has heretofore been considered by this court, and held infringed, in an action brought by the plaintiff herein against the United States Light & Heating Company (222 Fed. 310, affirmed 223 Fed. 1023, —— C. C. A. ——), and held not infringed in a case against its successor, the United States Light & Heat Corporation; it being shown in the latter case that defendant had not used Creveling's constant output generator regulator, but had adapted a so-called double relay ampere hour system, including the constant potential lighting system, described in the McElroy patent No. 893,533, of earlier date. In still another action against the Gould Coupler Company, the defendant herein, on patent No. 1,070,080, granted to H. G. Thompson for a specific improvement of the Creveling patent with relation to charging the storage battery and protecting it from injurious overcharge, the decision of this court (229 Fed. 429) that infringement was proven was reversed by the Circuit Court of Appeals on appeal (239 Fed. 861, 152 C. C. A. 645). A motion for preliminary injunction herein was denied by Judge Ray.

The case now coming before me at final hearing, the defendant company renews its attacks upon the validity of the patent in suit and the scope accorded the claims in the earlier litigation, denies infringement, and contends, inter alia, that the invention was for a specific addition to a known car-lighting system, to wit, the addition of a control setting or readjusting attachment for the regulator, which operated automatically in obedience to the state of the battery charge, and that in defendant's apparatus, which comprises a constant potential system claimed to operate upon an essentially different principle from plaintiff's constant current system, there are no means for resetting or readjusting the regulator to determine the current remaining constant during speed changes.

Before referring to the claims involved, it should be understood that it was concededly old at the date of the patent in suit to combine a dynamo driven at variable speed from the car axle, a storage battery, and lamps, means for charging the battery from the generator and for disconnecting the generator from the battery while the battery is supplying current to the lamps. Improvements on such system eventuated, which made it possible to supply current to the battery and lamps at the same time or alternately. It is therefore with specific means for maintaining a constant generator current for charging the battery, throughout speed changes, and also for regulating means for protecting the battery from overcharge, that we are herein concerned. Claims 1 to 8, inclusive, are involved; but it will suffice to reproduce claims 1, 5, and 8, which are characteristic of the others:

"1. In a system of electrical distribution, the combination with a generator adapted to be driven at variable speeds and a storage battery charged thereby of a regulator adapted to maintain given charging currents throughout changes in speed of the generator and means operated by changes in the difference of potential of the battery determining the said charging currents."

"5. In a system of electrical distribution, the combination of a generator, an accumulator charged thereby, means for maintaining the current output of the generator practically constant throughout changes in speed, and automatic means controlled by voltage of the accumulator for altering the current upon changes in voltage of said accumulator."

"8. In a system of electrical distribution, the combination of a generator, an accumulator, a regulating device for regulating the output of the generator, and supplemental means controlling the regulating device, to determine the said output."

These claims include the combination of (1) a dynamo driven at speed corresponding to the variable speed of the train, (2) a storage battery receiving its supply of current from the dynamo, and (3) a regulator maintaining charging current constant throughout speed changes and means which come into operation by changes or alterations in the potential or voltage of the battery for protecting the battery from injurious overcharge. Claim 8 is limited, and does not refer to battery protection. Such means were not essential to the supplemental means for determining the generator output to be maintained, and hence need not be read into the claims by implication.

The specification referring to the objects of the invention says:

"My invention relates to systems of electrical regulation, and has for its primary object to produce means for charging storage batteries from a genera-

tor running at variable speeds and to maintain a desired constant voltage upon the work circuit regulating the voltage directly by the output of the generator.

"A further object of my invention is to produce a construction whereby, when the batteries shall have reached a certain voltage—that is, when they have become practically charged—the charging rate will be automatically changed, it being well understood that the voltage necessary to charge the cells at the normal rate will remain almost constant until the cells are practically charged, when a considerable rise in voltage is necessary to maintain this normal charging current. I have shown means which, when this rise in voltage takes place, operate to lessen the charging rate, thereby avoiding a useless waste of current and evaporation of electrolyte due to violent gassing of the cells.

"My invention also, broadly considered, embodies a regulator adapted to maintain a constant current from a generator driven at variable speed and an interdependent regulator for determining the current which the regulator shall hold constant."

A statement of the principal characteristics of the invention with brief reference to the conclusions arrived at in the original suit may assist in understanding the respective contentions of the parties herein. The patent relates essentially to an apparatus for supplying electricity for separately lighting railroad cars, regardless of whether or not they are connected to other cars. In prior constant current regulators it was concededly difficult to correct the field current during the charging period because of speed variations. It was impossible to continue charging the battery from the dynamo and at the same time maintain a desired constant voltage or pressure upon the conductors or circuits, so as to actuate the necessary instrumentalities to regulate the voltage directly by the current output. It was a problem not easily solved. Indeed, Professors Scott and Puffer, testifying in this action for defendant, said that, in car axle lighting systems generally, correction for speed was the important question, and this court in the original suit practically decided that Creveling substantially solved the problem by regulating for a practically constant current, to wit, by his combination of means for controlling the current output for charging the battery and also automatically changing such current or charging rate by changing the voltage of the battery when it reached certain voltages or when the battery reached full charge, thus protecting it from injurious overcharge. By his combination of elements—old elements combined in a new and novel way—he achieved regulation for constant current from a variable speed generator, and by inclusion of another element, consisting of a voltage regulator or solenoid *31* (Fig. 1) and automatically bringing into regulating action field coil *9* (opposing coil *8*) located in shunt to the battery circuit, he altered or cut down the current, so as to protect the battery or determine the current which the regulator should hold constant.

In the original action a so-called stop charge apparatus, which operated to eliminate the charging current, and an apparatus with means for tapering off the current, were held infringements, since it was shown that a current regulating coil for maintaining constant current during speed changes, together with a voltage control device for regulating the current output were there employed. The proofs herein, as in the original suit, show that in Figures 1, 2, and 3 of the patent drawings there are traced a few structural modifications of the means

for carrying out the invention. In Figure 1 the current regulating coil is in the main circuit and as arranged predominates the voltage coil to decrease the generator output; while in Figure 2 the regulating coil is put in the battery branch and the device is provided with two windings in the lamp circuit for the purpose of varying the resistance (wires in shunt with the field coil) for making contact with the rheostat. The effect of such arrangement of wires was to permit the solenoid or relay to determine the charging rate which "is varied by varying the effect of coil 8." When the lamps are turned on, the current goes to the solenoid or relay 31, and through wires or neutralizing coils to obtain a constant battery charge, but upon turning the lamps off constant current is maintained during the period of battery charge, and is automatically cut down on the completion of the charge. In Figure 3 the pilot motor has two armature windings and a field winding (instead of two field windings and one armature winding, as in Figures 1 and 2), which function to increase the rotation of the motor in one direction and cause a rotation in the reverse direction upon one coil becoming stronger than the other, and in substantially this way the solenoid or relay wires protect, not only the battery from overcharge, but determine also the current to the battery which the regulator shall hold constant.

[1] Referring, now, more particularly to the evidence and contentions presented herein. The expert witnesses disagree widely as to the effect of the modified forms of the apparatuses described in the drawings and specifications to which reference has been made—that is, as to whether the regulations in Figures 2 and 3 are both for maintaining battery current constant and not the generator current; but I think it is unnecessary to enter at length into the details of the conflicting opinions as I believe that the solenoid 31 and wire connections or means for determining the current output, though differing in form for attaining the result, related essentially to a constant current regulator as distinguished from a constant potential regulator, and accordingly that the claims are limited to such a regulator. Concessions by the patentee in the Patent Office on interference with McElroy acknowledge such limitation. The difference between such modes of regulation, tersely stated, is that a regulator for constant current includes devices for modifying the voltage while the constant potential regulator of McElroy modifies or changes the variations of the current. The form of the apparatus or solenoid traced in Figures 2 and 3 is quite likely adjustable to correspond to lamp load, as testified by Mr. Hammer, for the purpose of regulating the battery charging current and maintaining it constant, but I think that such was not the intention of the patentee. Upon this point Mr. Waterman has made it clear that, if the patentee had wanted to provide for constant battery current regardless of lamp load, it would have been much easier to have arranged current coil 8 which receives the major portion of the current, in the battery branch of the main lead where it would have been affected only by the voltage changes, without the necessity of relying upon coil 31 to perform an additional function.

The patentee's method of arranging his wires, coils, and circuits persuasively indicates that the modified forms of the invention were, as

claimed by defendant, to stop the solenoid from functioning when the lamps were turned on, for in such case the danger of overcharge was much lessened or entirely eliminated. Several of the claims, it is true, refer to "charging currents," "determining the charging rate," and "altering the currents upon changes of voltage," causing one to suppose that the regulation was also for constancy of battery charging current; but the specified terminology seems to me to be equally readable upon the McElroy constant voltage regulation, and the scope of the patent in suit cannot be broadened to include such system. Mr. Waterman's testimony regarding the adaptability of the solenoid, acting alternately upon the current regulator, to determine its standard of regulation, and its operation to readjust or reset the known generator regulator finds corroboration in the specification, Complainant, however, contends that claim 8 is expressly limited to a regulating device substantially responding to such resetting or readjustment feature, but such supplemental means relate particularly to means for regulating the regulator, to the end that the generator output shall at all times and under all conditions be regulated and remain in a state of regulation, and not that it shall be responsive to voltage or battery control.

Defendant's regulator, as shown in Model Exhibit 4 and in Exhibit M-6, embodies a variable speed dynamo, a storage battery charged by it, a field winding, and lamps, together with a carbon pile resistance located in the field circuit. There are also concededly means (automatically operated) for keeping the generator current substantially constant during speed changes which are controlled by the voltage of the battery for changing or modifying the current upon changes in voltage of the battery. Such means, however, are not believed to be the equivalent of the means described in the Creveling patent under consideration. In lieu of a voltage controlled relay for readjusting the regulator relative to the state of the battery the defendant adapts in its so-called simplex system two independently acting generator regulators, without providing any readjusting or resetting device for determining their action. The first regulator embodying in its structure a voltage coil $8$ across the generator which operates to pull its core upward, so as to move the end of a lever attachment on the device upward, by a projection contacts the carbon pile to increase the resistance by separating the discs. When the voltage coil $8$ rests on its shoulders or stops regulation ceases. The second regulator has a current coil $5$ in series with the battery acting through its core on the end of a lever attachment which engages the carbon pile opposite the lever attached to the first regulator, each lever operating to increase or decrease the carbon pile resistance by separating the carbon discs. By their engagement with the carbons such levers effect the regulation of the generator to maintain constant battery current. When the core of coil $5$ is inactive, the core of coil $8$ raises above its base, and thereupon a short interval of constant voltage regulation results; but this is due to the weakness of the core. At such time the regulator is inoperative. The expert, Waterman, describing the operation of defendant's regulator, says:

"If the battery is in a discharged state, its voltage will be very low, and as soon as the speed of the train gets up high enough, a large current will flow

through it. This voltage being low, coil 8 will not be acted upon, but, there being a large current, coil 5 will be; so coil 5 will instantly assume the control by pushing up and down, as circumstances require with the varying speed, the regulator arm *4*. *Whichever operates, the system is a constant potential one.* This has reference to the fact that coil 5 is not, in this instance, in the generator circuit, but in the battery circuit; so that the characteristic attribute of the constant potential system—one of the characteristic differences between constant current regulation and constant voltage regulation—is that with the constant current regulation, properly so called, the generator cut-out is constant; the current is the same, whatever the regulator is set for. On this form of regulator, where the coil 5 is connected in the battery circuit, the current is not constant—the output is not constant—but it varies with the lamps; the more lamps, the more current; and that is an attribute of a constant voltage system; so a system arranged with this coil 5 is not in the main circuit, but in the battery branch, is more like a constant voltage system than it is like a constant current system. It has that characteristic of the constant voltage system, and since the battery voltage does not vary very widely, it is in effect a constant voltage; and as I shall show on further consideration, when the battery voltage begins to rise, its regulator ceases to act; so that with this defendant's apparatus *the generator is furnishing at all times a substantial constant voltage and it is never at any time furnishing a constant generator output.*"

[2] Complainant rejoins that infringement is not avoided as a constancy of current from the generator is evidently maintained during the period of charging the battery, and only upon nearing full charge is the voltage coil caused to operate automatically, resulting in a practical tapering off of the current to protect the battery. Defendant's adaptation of the voltage coil not improbably acts to attain this result; but in patent law it is nevertheless established that there is no infringement, where the result is attained by a new combination operating upon different principles, constituting a radical departure from the patent which is the subject of the suit.

It is not enough, where the patentee's claims are also for a combination of old elements, for a complainant to point out substantially the same elements in combination in a defendant's structure. It must also be shown by preponderating evidence that a defendant's system performs substantially the same function in substantially the same way. Complainant's patent in suit is for a certain mode of regulating a constant current generator throughout speed change, with battery protection, the elements forming the combination performing their functions in a specified way, while the elements in combination in defendant's apparatus, though perhaps at times incidentally operating to accomplish a similar result, are believed nevertheless to be dependent upon a widely different principle of operation. No solenoid for readjusting the voltage regulator is employed in defendant's structure to maintain constant its voltage regulator; it being shown that changes in the lamp load only bring about change of current and not change or alteration of potential.

In the original action (222 Fed. 310) it was not intended to accord the claims in suit such latitude as to include a regulator having no means for determining or altering the current that is maintained constant or one that is shown to regulate by independent means for constant voltage, but which likewise does not maintain the current con-

stant. The tests made by Professors Scott and Puffer, as indicated by the charts in evidence, are believed, notwithstanding complainant's criticism thereof, to support this mode of operation. See Exhibits L-4, L-6, L-8, L-9, and Q-5.

Defendant claims that the Creveling patent is anticipated by the prior patent to Sellon, No. 299,021, and especially by the Dick patent, No. 682,978, dated September 17, 1901, and as to claims 3, 4, and 8 by the Kennedy patent, No. 681,712. In Sellon's patent there are elements in combination, such as a variable speed generator, battery lamps, and constant current regulator for preventing overcharging the battery; but I think it fairly appears from the specification that the object of the patentee was to regulate for constancy of voltage only, and not for constant current throughout speed changes. His specified means for protecting the battery did not include a voltage control of the battery, and the float control or magnet shown, was, I think, incapable of performing such function. Neither the combination of Creveling, nor a regulation or control of the voltage of the battery is shown, and hence the patent was not anticipatory. The Dick patent is again strongly urged as completely anticipating all the claims in suit, and defendant's expert, Waterman, unequivocally testifies that in all material respects the Dick system therein described is the same as Creveling's. Such testimony is not contradicted.

The importance of the Dick patent was appreciated in former litigations, but it was believed not indistinguishable, as it relates mainly to train lighting with batteries on separate cars and in a different state of charge as the cars are connected or disconnected. From the opinion of the court it appears that disadvantages arose in such system from the placing of the current modifying coil on the generator side of the automatic switch or across the main terminals, which resulted in energizing the modifying coils, even while the train was standing, from which its impracticability was implied. Moreover, there was evidence apparently to show that the charging of the battery was not automatic, but required hand adjustment. However, in this case it is shown that Dick disclosed means for determining or altering the current output, maintained constant by a current coil for the purpose of protecting the battery from overcharge. Such means were not the means of Creveling, but on the evidence herein they must nevertheless be considered to have an important bearing upon the scope of the involved claims. In Figure 5 of the Dick patent there is illustrated a generator driven with variable speed from the axle of the car, a shunt field winding, battery, and lamps, together with wires and circuits arranged to vary the field and the dynamo by a regulating lever operating to vary the resistance coil located in series with the field winding $a$.'

[3] Defendant insists that such arrangement corresponds to regulation of the generator and to the movement in such regulator of the rheostat arm to vary the resistance in series with the field of the dynamo, and further that the Dick regulation was to maintain constancy of generator current throughout speed changes, while the battery was protected from overcharge by a solenoid with voltage and current

·coils thereon. ·In the Creveling patent, as heretofore pointed out, such coils oppose each other; but in Dick these windings are arranged to permit a somewhat different effect, the current coil functioning for a high standard of current, and on charging the battery a resistance coil located in series with the voltage coil is operated to reduce the charging ·current. It is undeniable that such .arrangement strikes one as being in all essentials not unlike Creveling's, although the specific means for readjusting the current to be maintained constant by the regulator is not disclosed. To Mr. Waterman's analysis of the Dick disclosure· complainant relies solely upon the failure of this court to find anticipation ·in the original litigation to which reference has been made. It is, I conceive, the duty ·of the court, regardless of any prior decisions on· the facts that may have been rendered in another case between different parties, to give force and effect to the evidence in the subsequent case, and resort to the testimony of other expert witnesses in another· ·action, embodied in another record, is not warranted. Walker on Patents (5th Ed.) § 634, p. 710; Beach v. Hobbs (C. C.)· 82 Fed. 916.

It is true that the evidence relating to the Dick patent consists of· the opinion and views of an expert, based upon his examination of the· prior disclosures, and is not binding upon the court, even though undisputed; still, as it relates to an admittedly abstruse subject, such views and opinions cannot be wholly disregarded. But in view of what has been stated herein with reference to different modes of operation of defendant's and complainant's apparatuses, the defense· of anticipation need not be passed upon.

Infringement not being established, the bill is dismissed, with costs.

4. PATENTS ⬤➾328—PATENTABILITY—INFRINGEMENT.
The Alvey patent, No. 790,811, for an elevator device for raising goods, *held* valid and infringed as to the five claims in suit.

---

⬤➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes